UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

DAVID PIRK, TIMOTHY ENIX a/k/a Blaze,
FILIP CARUSO a/k/a Filly, EDGAR DEKAY, II
a/k/a Ed a/k/a Special Ed, JASON WILLIAMS
a/k/a Toop, THOMAS KOSZUTA a/k/a
Kazoo, GREGORY WILLSON a/k/a Flip,
EMMETT GREEN, ROBERT OSBORNE, JR.,
STANLEY OLEJNICZAK, JACK WOOD a/k/a
Jake a/k/a Snake, RYAN MYRTLE, THOMAS
SCANLON a/k/a Tom, GLEN STACHARCZYCK
a/k/a Turbo, SEAN MCINDOO a/k/a Professor,

Defendants,

ANDRE JENKINS, a/k/a Little Bear,

Defendant-Movant.

**DECISION AND ORDER**

1:15-CR-00142 EAW



## **INTRODUCTION**

Defendant Andre Jenkins ("Jenkins") is one of 12 remaining defendants[1] named in a 46-count Second Superseding Indictment (Dkt. 33) ("Indictment") returned on March 16, 2016, alleging various crimes, including a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), pertaining to the operation of the Kingsmen Motorcycle Club ("KMC"). The Indictment alleges several predicate acts to support the RICO conspiracy count, but the most

---

[1]     Four Defendants—Edgar Dekay (Dkt. 412), Thomas Koszuta (Dkt. 296), Emmett
Green (Dkt. 257), and Ryan Myrtle (Dkt. 330)—have pleaded guilty.

significant allegations relate to the murders of Paul Maue and Daniel "DJ" Szymanski on September 6, 2014. Jenkins was prosecuted and convicted in state court for those murders and for a related weapons possession offense, and he contends that his prosecution in federal court for those same alleged crimes violates the Double Jeopardy Clause of the Fifth Amendment.

Presently before the Court is Jenkins' motion to dismiss the Indictment based on this double jeopardy argument, or for an evidentiary hearing and discovery on the applicability of the dual sovereignty doctrine. (Dkt. 522 at ¶¶ 79-91). Because the Court can determine that the dual sovereignty doctrine applies based on the record before it, and there is no need for an evidentiary hearing, the Court denies Jenkins' motion. Moreover, and in the alternative, the Court concludes that under the "same elements" test—the applicable standard for evaluating a double jeopardy challenge—the current prosecution does not violate the Double Jeopardy Clause.

## BACKGROUND

On August 20, 2015, Jenkins was convicted in Niagara County Supreme Court of one count of first-degree murder, two counts of second-degree murder, and one count of second-degree criminal possession of a weapon, for the murders of Paul Maue and Daniel "DJ" Szymanski. (Dkt. 637-1 at ¶¶ 3, 4, 7, 8). Jenkins was sentenced principally to life without parole; he is currently appealing his convictions. (*Id.* at ¶ 8; Dkt. 522 at ¶ 5).

Jenkins is charged in this Indictment with the following counts:

Count 1: RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (as to all Defendants);

- 2 -

Count 2:  Possession of firearms in furtherance of a crime of violence (the RICO conspiracy charged in Count 1), in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (as to all Defendants);

Count 19:  Murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (as to defendant David Pirk ("Pirk") and Jenkins);

Count 20:  Murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (as to Pirk and Jenkins);

Count 21:  Possession and discharge of firearm in furtherance of a crime of violence (murder in aid of racketeering charged in Count 19), in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2 (as to Pirk and Jenkins);

Count 22:  Possession and discharge of firearm in furtherance of a crime of violence (murder in aid of racketeering charged in Count 20), in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2 (as to Pirk and Jenkins);

Count 23:  Felon in possession of a firearm, in violation of 18 U.S.C §§ 922(g)(1) and 924(a)(2) (as to Jenkins only);

Count 45:  Using and maintaining premises for drug dealing, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (as to all Defendants); and

Count 46:  Possession of firearms in furtherance of drug trafficking crime (use and maintenance of premises for drug dealing charged in Count 45), in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (as to all Defendants).

(Dkt. 33). In short, the murders on September 6, 2014, give rise to some (but not all) of the counts set forth in the Indictment.

Jenkins filed his motion based on double jeopardy grounds on March 7, 2017, as part of his pretrial omnibus motions. (Dkt. 522). On April 7, 2017, the Government filed a response to Jenkins' pretrial motions. (Dkt. 554). On May 5, 2017, Jenkins filed a reply. (Dkt. 575). Oral argument was held before this Court on May 9, 2017 (Dkt. 593), and the Court gave Jenkins an opportunity to file a supplemental brief addressing whether

the offenses of his state court convictions are the same in fact and in law as those charged in this Indictment, such that double jeopardy is violated, (Dkt. 585). On June 16, 2017, Jenkins filed two memoranda: one arguing that the Court should look beyond the elements of the statutes of his state convictions and those charged in this Indictment, consider that the conduct for which he was prosecuted in state court is the same for which he is being prosecuted federally, and dismiss on double jeopardy grounds (Dkt. 636), and another arguing that the dual sovereignty doctrine does not apply (Dkt. 637). In support of the latter memorandum, Jenkins submitted the declaration of Dominic Saraceno, Esq. (one of Jenkins' defense attorneys in the state court proceeding); excerpts of transcripts of the state court proceeding; and a copy of a heavily-redacted document provided by the FBI to the attorneys in the state court proceeding. (Dkt. 637-1; Dkt. 637-2; Dkt. 637-3; Dkt. 637-4). On July 14, 2017, the Government filed a supplemental brief in opposition to Jenkins' arguments, which is supported by the affidavit of Assistant U.S. Attorney Joseph M. Tripi (the lead prosecutor in this federal case), and a proffer agreement signed by Jenkins. (Dkt. 673; Dkt. 673-1; Dkt. 673-2).

## DISCUSSION

Although Jenkins acknowledges that, in general, the "dual sovereignty doctrine" allows two separate sovereigns to prosecute a defendant who violates the laws of both sovereigns in a single act, he argues that this is "one of those rare examples" where the doctrine does not apply because the state prosecutors were not acting independently when they prosecuted Jenkins. (Dkt. 522 ¶ 87). According to Jenkins, the state prosecution was, in essence, a prosecution by the federal government because it controlled the

investigation, charge decision, and use of evidence by the state prosecutors. (*Id.* at ¶¶ 83-87; *see* Dkt. 637).[2]  As an alternative to outright dismissal, Jenkins seeks disclosure of information concerning the federal government's involvement in the state prosecution and a hearing to determine whether the federal government should be allowed to proceed and what role it played in the state prosecution. (*Id.* at ¶¶ 90-91; Dkt. 637 at 5-6).

Jenkins also argues that the federal prosecution violates double jeopardy because "the range of conduct proven against [him] in the New York State prosecution virtually mirrors the conduct for which the [federal] government now attempts to prosecute him." (Dkt. 636 at 18).

---

[2]     Jenkins argues that not only was the state prosecution a tool of the federal government, but he also contends that the federal government violated his due process rights to a fair trial in state court by initially refusing to produce or share evidence and later producing evidence only at the eleventh hour in a redacted form. (Dkt. 637 at 2-5). In support of this argument, Jenkins submits transcripts from the state court prosecution (Dkt. 637-2; 637-3), where among other things, the state court trial judge expressed her concerns about the "possibility that these actions by the federal government are going to come back to bite you [referring to the state prosecutor] in this case. . . ." (Dkt. 637-3 at 3; *see id.* at 6 (state court judge stating that defense counsel may be correct that federal government's refusal to provide information may be interfering with Jenkins' right to a fair trial and "that may come back to haunt this case, but I'm not positive about that so we keep going.")).  Indeed, the state prosecutor also expressed frustration about the situation. (*Id.* at 6 ("It's not like we have items that we're not sharing with them. They [referring to the FBI] are not sharing with us certain things either."); *id.* at 5 (state prosecutor stating that, like defense counsel, her office also was not provided with any opportunity to submit their arguments to a federal judge in an attempt to obtain federal grand jury transcripts)).

Jenkins' arguments in this regard should be resolved by the state appellate court, not this Court.  While this Court understands that Jenkins has made this argument in an effort to show that the federal government was controlling the state court prosecution, the colloquy among counsel and the state court judge actually supports the view that the federal government was <u>not</u> working with the state prosecutor's office to pursue Jenkins' prosecution—indeed, the state prosecutor also appears frustrated with the situation.

For the reasons discussed below, Jenkins' argument that the dual sovereignty doctrine does not apply is without merit, and no additional fact-finding or discovery is warranted. As a result, the Court need not reach his "same conduct"-based arguments, but alternatively finds that, under the applicable "same elements" test, the current prosecution does not violate double jeopardy.

## I.    Dual Sovereignty

### A. General Principles

The Double Jeopardy Clause of the Fifth Amendment states as follows. "No person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. Const. amend. V. "The double jeopardy clause protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *United States v. Persico*, 832 F.2d 705, 710 (2d Cir. 1987) (holding that double jeopardy did not bar defendants' RICO convictions that were predicated on acts related to a bribery scheme after defendants pleaded guilty to bribery charges); *see also United States v. Basciano*, 599 F.3d 184, 196 (2d Cir. 2010) ("This Double Jeopardy Clause protects against both multiple punishments and successive prosecutions for the same offense, regardless of whether a first prosecution resulted in conviction or acquittal.").

The "well-established . . . doctrine of dual sovereignty . . . holds that a state prosecution does not bar a subsequent federal prosecution of the same person for the same act." *United States v. Coonan*, 938 F.2d 1553, 1562 (2d Cir. 1991). It is based on the concept that "a defendant whose conduct violates the laws of two sovereigns has

'committed two different offenses by the same act'" which can be prosecuted by the two separate sovereigns without violating double jeopardy. *United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 493 (2d Cir. 1995). The doctrine is not without exception: "[C]ircumstances may exist in which state and federal prosecutions are so intertwined as to undermine the assumption that two supposedly independent criminal actions were prosecuted by separate sovereigns." *Id.* at 1563. "The key criterion in determining whether the application of this exception is warranted '[is] not the extent of control exercised by one prosecuting authority over the other but rather the ultimate source of the power under which the respective prosecutions were undertaken.'" *Id.* (quoting *United States v. Wheeler*, 435 U.S. 313, 320 (1978)).

This is referred to as the *Bartkus*[3] exception, named for one of the cases in which the doctrine was "most prominently expounded." *G.P.S. Automotive Corp.*, 66 F.3d at 493. Pursuant to the *Bartkus* exception, "[t]he Double Jeopardy Clause may be violated despite single prosecutions by separate sovereigns when one prosecuting sovereign can be said to be acting as a tool of the other." *Id.* at 494 (quotation omitted). In other words, the exception protects against a scenario where the federal government, in essence, pursues two separate prosecutions—one in state court and one in federal court—and yet relies on the dual sovereignty doctrine to thwart any challenge to the duplicate prosecutions on double jeopardy grounds. This exception is to be applied "only in an 'extraordinary type of case' . . . perhaps only when one sovereign has essentially manipulated another sovereign into prosecuting." *Id.* at 495 (internal citation omitted).

---

[3]      *Bartkus v. Illinois*, 359 U.S. 121 (1959).

Courts have "repeatedly held that even significant cooperation between state and federal authorities does not provide a basis for applying the *Bartkus* exception," and "every circuit to consider the issue has also held that the cross-designation of a state district attorney as a federal official to assist or even to conduct a federal prosecution does not by itself bring a case within the *Bartkus* exception to the dual sovereignty doctrine." *Id.* at 495.[4]   At bottom, the Second Circuit has "not conflated the sovereigns where there was no persuasive evidence that the state 'acted as a tool of the federal government.'" *United States v. Peterson*, 100 F.3d 7, 12 (2d Cir. 1996) (quoting *United States v. Ng*, 699 F.2d 63, 68 (2d Cir. 1983)).

Similar to Jenkins' arguments here, in *United States v. Russotti*, 717 F.2d 27 (2d Cir. 1983), the defendants argued that "the federal government was so deeply involved in the state murder prosecution as to preclude application of the dual sovereignty rule" to the extent that the federal RICO charge was based on a predicate act of murder that served as the basis for the state court prosecution. *Id.* at 30.   The defendants also contended that, at a minimum, they were entitled to an evidentiary hearing on the issue. *Id.*   The Second Circuit rejected those arguments, concluding that the case did not fall within the *Bartkus* exception, and that the dual sovereignty doctrine foreclosed the double jeopardy argument, because the record showed that the state and federal authorities acted

---

[4]   In *G.P.S. Automotive Corp.*, the Second Circuit considered whether a civil forfeiture action came within the *Bartkus* exception, and held that further fact-finding was required on the applicability of the *Bartkus* exception due to "a factor unique to forfeiture cases and one not considered by the District Court." 66 F.3d at 495. That unique factor was the allegation that "the state will ultimately receive a very large percentage of whatever forfeiture proceeds are derived from the federal action," *id.* at 496, a circumstance not present in this case.

independently of one another. Although there was cooperation between the state and federal authorities, the *Bartkus* exception was not implicated when the dual sovereigns cooperated together—in fact, "cooperation between state and federal police agencies and prosecutorial organizations is both laudatory and desired." *Id.* (quotation omitted); *see also United States v. Aboumoussallem*, 726 F.2d 906, 910 (2d Cir. 1984) (holding that allegations were insufficient to warrant application of *Bartkus* exception where there was "no more than a joint investigation of criminal activity, which [the Second Circuit has] held does not preclude separate prosecutions").

In *Russotti*, the Second Circuit also considered whether the district court improperly denied the defendants a hearing on the dual sovereignty question. *Id.* It concluded that the district court had not, reasoning that the defendants had "offered little in the way of proof of federal orchestration of the state murder trial other than the barest conclusory allegations," and "the uncontradicted affidavit of Special Assistant United States Attorney Robert L. King describing in detail the limited federal involvement in the Massaro murder trial obviated whatever necessity there may have been for conducting a hearing." *Id.* The Second Circuit further explained that whether to grant an evidentiary hearing is a discretionary decision of the district court. *Id.*

### B. Applications of the Dual Sovereignty Doctrine by District Courts

Following *G.P.S. Automotive* and *Russotti*, district courts within the Second Circuit have repeatedly rejected defendants' arguments that the *Bartkus* exception applied and that an evidentiary hearing should be held. *See United States v. Perryman*, No. 12-CR-0123 (ADS), 2013 WL 4039374, at *3-5 (E.D.N.Y. Aug. 7, 2013); *United States v.*

*Burke*, No. 09 CR 135(SJ), 2011 WL 2609837, at *2-3 (E.D.N.Y. July 1, 2011), *aff'd*, 552 F. App'x 60 (2d Cir. 2014); *United States v. Castro*, 659 F. Supp. 2d 415, 418-19 (E.D.N.Y. 2009), *aff'd*, 411 F. App'x 415 (2d Cir. 2011); *United States v. Moore*, No. 00 CR. 1077(LMM), 2001 WL 674146, at *3-5 (S.D.N.Y. June 15, 2001).

In *Perryman*, the district court held that "a defendant bears the burden of proving that the state and federal prosecutions are so intertwined as to undermine the assumption that the two supposedly independent criminal actions were prosecuted by separate sovereigns" in order to benefit from the *Bartkus* exception. 2013 WL 4039374 at *4 (quotation omitted). The defendant submitted a press release which suggested that state and federal authorities had worked together, but failed to provide evidence that the state authorities acted as a tool of the federal authorities. *Id.* at *5. The district court therefore concluded that no hearing was warranted on the issue. *Id.*

In *Castro*, the district court concluded that the *Bartkus* exception did not apply because the defendant relied only on "conjecture and the chronology of the respective prosecutions in attempting to satisfy his onerous burden." 659 F. Supp. 2d at 419. Further, no evidentiary hearing was warranted because "the affidavit from former Assistant District Attorney Schroeder obviate[d] the need to conduct a hearing into Castro's allegations," and the defendant "failed to offer any evidence that the USAO effectively controlled his state prosecution." *Id.*

In *Burke*, the district court concluded that mere cooperation between the state and the federal government did not warrant a hearing in the case, even if one assumed the truth of all the factual allegations set forth in the defendant's motion:

> that (i) the FBI requested the State investigate Burke for the murder of Gebert four months before he was indicted by State prosecutors; (ii) a FBI agent continued to participate in the investigation of the State's case including being present for the interview of key State witnesses, and (iii) that the State shared its investigative reports and progress on the case with the FBI. . . .

2011 WL 2609837 at *3. The *Burke* court also rejected the defendant's argument that a hearing was warranted because the Government had failed to submit a supporting affidavit from the state, as had occurred in *Russotti*. *Id.* The *Burke* court noted that the dispositive issue in *Russotti* was not the existence of the Government's affidavit, but rather "that the defendants there, similar to Burke here, 'offered little in the way of proof of federal orchestration other than the barest conclusory allegations.'" *Id.* (quoting *Russotti*, 717 F.3d at 31).

In *Moore*, the district court denied discovery and an evidentiary hearing on the issue of the *Bartkus* exception. 2001 WL 674146, at *5. In so doing, it distinguished *G.P.S. Automotive* on the basis that the additional fact-finding was necessary because of the unique issue in a forfeiture action, which was whether the state would receive a disproportionate share of the forfeiture proceeds as a result of the federal action. *Id.* at *4.

### C. Analysis

In order to sustain his burden to show that the state was manipulated by the federal government and was merely a tool of federal authorities, Jenkins relies on the declaration of Dominic Saraceno, Esq. ("Saraceno"), who was one of Jenkins' defense attorneys in the state court proceeding and who first appeared in that case on December 3, 2014 (Dkt.

637-1 at ¶ 5), as well as transcripts from the state court proceeding and a heavily-redacted document received from the FBI, (Dkt. 637-2; Dkt. 637-3; Dkt. 637-4). Saraceno asserts his belief that "federal authorities controlled decisions related to disclosure of evidence, witnesses, and prosecution strategy," (Dkt. 637-1 at ¶ 26), that "the prosecution appeared to be controlled by the federal government" (*id*. at ¶ 13), and that "the actions of the United States Attorney's Office and the federal agents substantially, if not deliberately, interfered with Mr. Jenkins' right to a fair trial in the Niagara County Court," (*id*. at ¶ 27). According to Saraceno, it was "clear" to him that the U.S. Attorney's Office and "specifically AUSA Joseph Tripi" were "deeply involved in the prosecution of Mr. Jenkins by Niagara County." (*Id*. at ¶ 15).

According to Saraceno, federal agents and prosecutors engaged in the following conduct in order to control the state prosecution. Saraceno claims that he was advised that state and federal prosecutors held a meeting at which it was decided that the state would prosecute Jenkins first. (*Id*. at ¶ 14). He claims that federal agents "reviewed most of the civilian witnesses presented by the People at trial," "were present for at least two of the three identification procedures," and "initiated the extensive search for the alleged murder weapon and recruited other members of law enforcement to assist them." (*Id*. at ¶¶ 10, 11, 12). He also states that Jenkins received an offer to plead guilty to two counts of first-degree manslaughter in state court in exchange for his cooperation, and if Jenkins accepted, the U.S. Attorney's Office would consider not charging him federally; similarly, one witness against Jenkins had a federal plea agreement, and another had a federal cooperation agreement. (*Id*. at ¶¶ 16, 23, 24).

It appeared to Saraceno that the state prosecutor would not respond to any requests or questions from the defense without consulting the U.S. Attorney's Office. (*Id.* at ¶ 17). Saraceno states that although they received some federal documents concerning witnesses, many of the documents received were redacted. (*Id.* at ¶ 19; *see also* Dkt. 637-4 (redacted FBI document)). He also states that he was not provided a complete list of persons interviewed by federal authorities or copies of witnesses' federal grand jury testimony. (Dkt. 637-1 at ¶¶ 18, 21). Moreover, according to Saraceno, he was not provided an opportunity to be heard (either orally or by written submissions) on the Government's motion to disclose redacted federal grand jury testimony, which motion was apparently filed subsequent to the defense demands for these transcripts and denied by United States District Judge Richard J. Arcara. (*Id.* at ¶ 22; Dkt. 637-2 at 1-2 (transcript)). Saraceno also recalls that "members of federal law enforcement and/or the United States Attorney's Office were present in the court room every day of the trial, observing the proceedings." (Dkt. 637-1 at ¶ 25).

In response to the Saraceno Declaration, the Government provides the affidavit of AUSA Tripi ("Tripi"). (Dkt. 673-1). Tripi denies having any role in the state investigation of the murders of Paul Maue and Daniel Szymanski, or any involvement in the state prosecution of Jenkins. (*Id.* at ¶¶ 6, 15). In the main, Tripi contends that the federal prosecutors could not have orchestrated the state prosecution because he was engaged in the preparation for and trial of other matters (*id.* at ¶¶ 4, 18, 26), and was on leave and out of the district at times (*id.* at ¶¶ 9-14, 26, 28).

Tripi also addresses specific aspects of the Saraceno Declaration. For example, he states that he did attend—but merely observed—a meeting at the North Tonawanda Police Department attended by local police officers, federal task force officers, and a representative from the Niagara County District Attorney's Office; further, he denies that a meeting between the state and federal prosecutors occurred as claimed by Saraceno. (*Id.* at ¶¶ 8, 14, 45). Tripi also states that Jenkins had a proffer meeting (scheduled by Saraceno) and signed a proffer agreement with the U.S. Attorney's Office, (*id.* at ¶¶ 31, 48; Dkt. 673-2), but he ultimately did not proceed with the proffer (Dkt. 673-1 at ¶ 31). Because Jenkins did not proffer, according to Tripi, discussions of any benefit that the U.S. Attorney's Office may confer on Jenkins never progressed and no plea offers were made by the U.S. Attorney's Office. (*Id.* at ¶¶ 31-32). Tripi states that the U.S. Attorney's Office was not involved in the FBI's disclosure of FBI 302s concerning witnesses at the state trial, but he maintains that the FBI would redact information that went beyond the scope of the state murder charges. (*Id.* at ¶ 33). Tripi also points out differences between the state and federal proceedings: Jason Williams, a co-defendant in Jenkins' federal case, was an uncharged civilian witness in the state court proceedings, and the U.S. Attorney's Office had access to voluminous information obtained from the federal investigation that it did not share with the state prosecutors. (*Id.* at ¶¶ 36, 37).

Thus, in many ways, Saraceno and Tripi present competing versions of events. However, for the reasons discussed below, the Court finds the Saraceno Declaration and accompanying exhibits insufficient to sustain Jenkins' burden to show that the state prosecution was controlled by the federal government.

- 14 -

The Saraceno Declaration is, in many respects, not based on his personal knowledge, and instead contains conclusory statements based on his "beliefs."  For example, Saraceno states that he "was advised"—without stating by whom, when, or under what circumstances he received such information—that a meeting had occurred between members of the Niagara County District Attorney's Office and the U.S. Attorney's Office, and at that meeting, "it was decided that the state could prosecute [Jenkins] first."  (Dkt. 637-1 at ¶ 14).  Several other statements within the Saraceno Declaration are based on his beliefs or what "seemed" to be the circumstances.  (Dkt. 637-1 at ¶¶ 12, 13, 17, 18, 26, 27).  Saraceno also states, in a conclusory manner, that he "believe[s] there was federal involvement in almost every aspect of the case from the investigation to the trial in the Niagara County Court, so much so that the prosecution appeared to be controlled by the federal government."  (*Id.* at ¶ 13).  It is insufficient for Jenkins to rely "on conjecture and the chronology of the respective prosecutions . . . to satisfy his onerous burden."  *Castro*, 659 F. Supp. 2d at 419.

Setting aside conclusory statements or opinions, Saraceno otherwise describes what amounts to cooperation between state and federal authorities.  However, "the Second Circuit has repeatedly held that joint-cooperation between state and federal authorities 'fall[s] short of showing the sort of manipulation that could avoid the general rule.'"  *Perryman*, 2013 WL 4039374, at *5 (quoting *Aboumoussallem*, 726 F.2d at 910); *see also Russotti*, 717 F.2d at 30-31 (finding cooperation between state and federal authorities was not only permissible, but also "laudatory and desired," and further finding that such cooperation did not show that the state prosecution was merely a cover for the

federal authorities). Much of what Saraceno describes in his affidavit amounts to just that: joint cooperation between state and federal law enforcement and prosecutorial organizations. (*See* Dkt. 637-1 at ¶¶ 10-11 (alleging that federal agents reviewed civilian witnesses and were present for identification procedures), 14 (alleging meeting at which state and federal prosecutors decided which jurisdiction would prosecute first); Dkt. 637-3 (alleging federal involvement in Jenkins' state plea negotiations)). But cooperation, without more, is insufficient to show that the federal authorities were so highly involved in the state prosecution that the state prosecution was a sham. *See Burke*, 2011 WL 2609837, at *3 (finding only mere cooperation shown, even assuming the truth of the defendant's allegation "that (i) the FBI requested the State investigate [the defendant] for the murder . . . four months before he was indicted by State prosecutors; (ii) a FBI agent continued to participate in the investigation of the State's case including being present for the interview of key State witnesses, and (iii) that the State shared its investigative reports and progress on the case with the FBI").

Moreover, the fact that federal agents were present at the state court proceeding is not evidence that the federal authorities effectively controlled the state prosecution. "[T]he mere presence of a government agent at the state court proceeding does not implicate double jeopardy or due process in any way." *United States v. Paul*, 853 F.2d 308, 311 (5th Cir. 1988); *see also Burke*, 2011 WL 2609837, at *3 (finding exception to dual sovereignty doctrine did not apply even where, *inter alia*, a FBI agent participated in the investigation of the State's case and was present for the interview of key State witnesses).

In sum, Jenkins has failed to show that the federal authorities were the ultimate source of power over his state prosecution. Indeed, the Tripi Affidavit, which in contrast to the Saraceno Declaration contains detailed information based on firsthand personal knowledge of the federal prosecution and activities of federal prosecutors, denies that the federal prosecutors controlled the state prosecutors' charging decisions or the course of the litigation in state court. (Dkt. 673-1 at ¶ 46). Further, the Tripi Affidavit provides evidence of the state prosecutors' independence. (*See id.* at ¶¶ 36-37).

Based on the foregoing, the Court finds that Jenkins' alleged facts are insufficient to meet his burden to show that the state was acting as a tool of the federal government, or demonstrate that an evidentiary hearing is warranted. *See Russotti*, 717 F.2d at 31 (the detailed affidavit of the federal prosecutor "obviated whatever necessity there may have been for conducting a hearing"); *see also Perryman*, 2013 WL 4039374, at *3-5; *Burke*, 2011 WL 2609837, at *2-3; *Castro*, 659 F. Supp. 2d at 418-19; *Moore*, 2001 WL 674146, at *3-5.

Nor is Jenkins entitled to discovery and disclosure of state-federal communications. Jenkins does not cite the basis on which he makes his request for disclosure, but under Fed. R. Crim. P. 16, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense. . . ." Fed. R. Crim. P. 16(a)(1)(E)(i). The Ninth Circuit has interpreted Rule 16 discovery requests concerning

- 17 -

federal involvement in state prosecutions for double jeopardy purposes and held that discovery is not warranted where the defendant "failed to 'make a prima facie showing of materiality' under Rule 16" because the defendant "did not make 'a preliminary showing of "inter-sovereign collusion," as opposed to mere "inter-sovereign cooperation."'" *United States v. Lucas*, 841 F.3d 796, 805 (9th Cir. 2016) (quoting *United States v. Zone*, 403 F.3d 1101, 1107 (9th Cir. 2005) (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990))).  Having failed to make a preliminary showing of "inter-sovereign collusion," as described above, Jenkins is not entitled to the discovery he seeks.  *See Moore*, 2001 WL 674146, at *5 (denying discovery and an evidentiary hearing where no preliminary showing was made that one prosecuting sovereign was acting as a tool of the other).

## II.     "Same Conduct"-Based Arguments

Because the dual sovereignty doctrine applies and the circumstances of Jenkins' state and federal prosecutions do not warrant the application of the *Bartkus* exception to that doctrine, "the state prosecution does not bar [the] subsequent federal prosecution of [Jenkins] for the same act[s]." *Coonan*, 938 F.2d at 1562.  Accordingly, the Court need not resolve Jenkins' arguments that the conduct proven against Jenkins in the state trial is the same conduct for which the Government now prosecutes him.

However, to be clear, the murders on September 6, 2014, that were the subject of the state court prosecution, do not serve as the basis for all of the charged conduct against Jenkins in this federal case—including a RICO conspiracy count and a charge of using and maintaining a premises for drug trafficking both spanning a 10-year time period—

and thus, even if his arguments on double jeopardy grounds were credited, it would not result in dismissal of the entire Indictment against Jenkins.

Furthermore, for the reasons discussed below, the Court alternatively concludes that the crimes for which Jenkins is charged in the federal prosecution are different in law under the same elements test articulated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), and as a result, double jeopardy does not bar the federal prosecution.

As an initial matter, neither Jenkins' motion to dismiss, nor his reply submitted in further support of that motion, argues that the offenses of which he was convicted in state court are the same in law as the offenses with which he is presently charged in federal court. (*See* Dkt. 522 at ¶¶ 79-91 (motion disputing applicability of dual sovereignty doctrine); Dkt. 575 at 11 (reply papers arguing that "[t]he numerous overt acts set forth in the indictment clearly show that the acts for which Mr. Jenkins was previously convicted are the same acts which the government intends to prove at the time of trial")). Further, in his supplemental brief addressing whether the offenses of his state court convictions are the same as those charged in the federal indictment, Jenkins argues that the Court should "examin[e] the allegations of the indictment rather than simply review[] terms of the statute" and conclude that double jeopardy has been violated because the same conduct is at issue in both the state and federal prosecutions. (Dkt. 636 at 17). In other words, Jenkins argues that a "same conduct" test applies, and does not appear to dispute that the state offenses are different in law than the federal offenses. (*See id.*).

Jenkins' assertion that the Court should apply a "same conduct" test is without merit. "In the case of successive prosecutions, the critical inquiry is whether the offenses

are the same in fact and in law." *Basciano*, 599 F.3d at 196 (quotation omitted). Where, as here, a defendant stands accused of crimes under different statutes, "the standard for analyzing whether offenses are the same in law is the same-elements test established in *Blockburger*," 284 U.S. at 304. *Id.* at 196-97. "That test asks whether 'each offense contains an element not contained in the other,' and provides that, if not, 'they are the "same offence" and double jeopardy bars additional punishment and successive prosecution.'" *Id.* at 197 (citation omitted). In other words, it requires comparing the charges to determine if they "require proof of different elements and, therefore, are legally distinct." *Id.* at 198. If they require proof of different elements, no double jeopardy has occurred. *Id.* In *Basciano*, for example, the Second Circuit concluded that a defendant may be charged with conspiring to commit a violent crime in aid of racketeering under 18 U.S.C. § 1959(a)(5), even if he has already been convicted of RICO conspiracy under 18 U.S.C. § 1962(d), because those conspiracies require proof of different elements and therefore are legally distinct. *See id.* at 198-99.

Jenkins relies on *United States v. Seda*, 978 F.2d 779 (2d Cir. 1992), for the proposition that the Court may look not only at the terms of the statutes, but also at the allegations of the indictment. (Dkt. 636 at 15). However, as the Government rightly points out, *Seda* was later abrogated by *United States v. Dixon*, 509 U.S. 668 (1993), which rejected the "same conduct" test, which "prohibits 'a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution . . . the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted,'" *id.* at 703-04 (quoting *Grady v. Corbin*, 495 U.S. 508, 510

(1990)) (alterations omitted).  *See United States v. Chacko*, 169 F.3d 140, 147 (2d Cir. 1999) (recognizing abrogation).  As the Second Circuit stated in *Chacko*, "[t]o the extent that appellant uses *Seda* to support the proposition that it is appropriate to examine the specifics of the indictment and the nature of the counts charged when the underlying statute is broad, the implications of *Dixon* are preclusive." *Id.*

Following *Dixon*, the Second Circuit suggested in *United States v. Liller*, 999 F.2d 61 (2d Cir. 1993), another case relied upon by Jenkins (Dkt. 636 at 17), that "in certain circumstances, including where one of the statutes covers a broad range of conduct, it is appropriate under *Blockburger* to examine the allegations of the indictment rather than only the terms of the statutes."  999 F.2d at 63.  Jenkins also points to *United States v. Sessa*, 125 F.3d 68 (2d Cir. 1997), for a similar proposition (Dkt. 636 at 16-17).  However, in *Sessa*, the Second Circuit referred to the *Liller* approach as mere speculation and "dictum." *Sessa*, 125 F.3d at 73.

A recent Second Circuit decision—*Basciano*—makes clear that the *Liller* and *Sessa* line of cases is not viable.  599 F.3d at 198.  In *Basciano*, the Second Circuit rejected a defendant's assertion that the court should look beyond the terms of the statutes and consider the allegations of the indictment and explained the status of the conduct-based analysis that Jenkins requests:

> In the immediate aftermath of *Dixon,* this court briefly entertained the possibility that, in situations "where one of the statutes covers a broad range of conduct," examination of "the allegations of the indictment rather than only the terms of the statutes" would be appropriate to a double jeopardy assessment. *United States v. Liller,* 999 F.2d 61, 63 (2d Cir. 1993). . . .

> After *Liller*[,] . . . this court construed *Dixon* to preclude fact-based analysis of double jeopardy claims based on successive prosecutions under different statutes. In our 1999 decision in *United States v. Chacko,* we held that *Dixon* forecloses examination of "the specifics of the indictment and the nature of the counts charged [even] when the underlying statute is broad." 169 F.3d at 147. We explained that the critical double jeopardy inquiry is not factual, *i.e.,* whether the same conduct is at issue in charges brought under different statutes, but legal, *i.e.,* "whether the 'offense'-in the legal sense, as defined by Congress-complained of in one count is the same as that charged in another." *Id.* at 146; *see also id.* at 148 (holding that bank fraud charged under 18 U.S.C. § 1344 and making false statements to financial institution charged under § 1014 are not same offense for double jeopardy purposes despite potential overlap in proof of elements).

*Id.* Accordingly, the "same elements" test is the appropriate standard for assessing double jeopardy claims in this case, and the Court declines to consider the allegations of the Indictment as Jenkins suggests.

Applying the "same elements" test in this case, the Court agrees with the Government that the elements of the offenses of which Jenkins was convicted in state court are different in law than those with which he is charged in the instant federal prosecution (a point which, as discussed, Jenkins apparently does not dispute). (*See* Dkt. 554 at 31-40). Accordingly, the Court alternatively concludes that, even if the dual sovereignty doctrine did not apply, Jenkins' double jeopardy challenge nevertheless fails.

## CONCLUSION

For the foregoing reasons, the Court denies Jenkins' motion to dismiss the Indictment based on double jeopardy grounds, as well as his requests for an evidentiary hearing and discovery on that issue. (Dkt. 522 at ¶¶ 79-91).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: July 24, 2017
      Rochester, New York