UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THE UNITED STATES OF AMERICA              15-CR-142-EAW-MJR
                                          AMENDED
                                          REPORT, RECOMMENDATION
                                          AND ORDER
           v.


ANDRE JENKINS, et al.,

                    Defendants.
_____

       This case was referred by the presiding judge, the Honorable Elizabeth A. Wolford,

to this Court, pursuant to 28 U.S.C. §636(b)(1), to handle certain non-dispositive

discovery motions and to make a recommendation as to all suppression motions.  (Dkt.

No. 436).  Before the Court is a motion by defendant Andre Jenkins ("defendant" or

"Jenkins") to suppress evidence and statements obtained on November 10, 2014, as well

as various omnibus discovery demands.[1]  (Dkt. No. 522).  For the following reasons, it is

recommended that defendant's motion to suppress evidence and statements be denied.

The Court's decisions as to defendant's various omnibus discovery demands are also set

forth in detail below.

## BACKGROUND AND PROCEDUREAL HISTORY

       On March 16, 2016, a Second Superseding Indictment (the "Indictment") was filed

charging Jenkins, as well as fifteen other members of the Kingsmen Motorcycle Club

_____

[1] Judge Wolford and the undersigned previously divided the pretrial motions between themselves in order
to expedite this case.  (Dkt. No. 436).  Therefore, some of the requests in defendant's omnibus demands
are before Judge Wolford, and some are before this Court.  Specifically, defendant's motions to dismiss,
motion for a change of venue and motion for a bill of particulars are before Judge Wolford.  (Dkt. No.
534).  The remaining omnibus demands are before this Court and are addressed herein.

("KMC"), with various crimes including racketeering conspiracy, drug trafficking, firearms offenses, Hobbs Act robbery, assault, perjury, obstruction of justice, attempted murder in aid of racketeering and murder in aid of racketeering. (Dkt. No. 33). The Indictment alleges, *inter alia*, that defendants distributed cocaine, marijuana, and other controlled substances, maintained various premises for drug distribution, sold untaxed cigarettes for a profit, and possessed firearms and ammunition for unlawful purposes. With respect to the racketeering conspiracy, the Indictment alleges that purposes of the enterprise included the distribution of controlled substances as well as maintaining premises for the use and distribution of controlled substances, the sale of firearms, the sale of cigarettes and alcohol, the promotion of prostitution and other criminal activities. It is alleged that another purpose of the enterprise was to protect and preserve the KMC's power through violence, threats of violence, intimidation, assaults and murder.

Jenkins is charged in Count 1 (RICO Conspiracy), Count 2 (Possession of Firearms in Furtherance of Crime of Violence). Count 19 (Murder in Aid of Racketeering), Count 20 (Murder in Aid of Racketeering), Count 21 (Possession and Discharge of a Firearm in Furtherance of Crime of Violence), Count 22 (Possession and Discharge of a Firearm in Furtherance of Crime of Violence), Count 23 (Felon in Possession of Firearm), Count 45 (Using and Maintaining Premises for Drug Dealing), and Count 46 (Possession of Firearm in Furtherance of Drug Trafficking Crime). The two counts alleging murder in aid of racketeering involve the shooting deaths of KMC members Paul Maue and Daniel "DJ" Szymanski on September 6, 2014. On August 20, 2015, a Niagara County Supreme Court jury convicted Jenkins of one count of Murder in the First Degree, Two Counts of

Murder in the Second Degree and one count of Criminal Possession of Weapons in the Second Degree as a result of the murders of Maue and Szymanski.

On March 3, 2017, defendant filed an omnibus motion seeking various discovery and other forms of relief, including a motion to suppress statements and evidence obtained by police during the traffic stop of a vehicle, in which he was a passenger, in Darien, Georgia, on November 10, 2014. (Dkt. No. 522). The Government filed a response to defendant's motions on April 7, 2017 (Dkt. No. 554) and defendant filed a reply on May 5, 2017 (Dkt. No. 575). On May 8, 2017, the Court denied the Government's request to deny defendant's suppression motion without a hearing. (Dkt. No. 577). A suppression hearing was held before this Court on May 25, 2017 and included the testimony of Anthony Brown, a lieutenant in the Darien Police Department in Darien, Georgia. Brown testified, *inter alia*, that during the traffic stop he used a narcotics detection canine during his search of the vehicle. At the conclusion of the hearing, defense counsel requested the certification records for the canine, as well as any field records memorializing the canine's performance in the field. The Court instructed the Government to produce the canine's certification records but denied defendant's request for the field records.

The Government filed a post-hearing brief on August 7, 2017 (Dkt. No. 720), defendant filed a post-hearing brief on August 8, 2017 (Dkt. No. 722), the Government filed a reply on August 21, 2017 (Dkt. No. 742), and defendant filed a reply on August 22, 2017 (Dkt. No. 747). Oral argument was held before this Court on August 25, 2017. At the conclusion of oral argument, and pursuant to the Second Circuit's decision in *United States v. Foreste*, 780 F.3d 518 (2d Cir. 2015), the Court granted defendant's request for

any field performance records kept with respect to the canine used by Brown during the November 10, 2014 traffic stop.  The Government filed a Supplementary Submission Regarding Canine Field Performance Records on September 15, 2017.  (Dkt. No. 788).  Defendant filed a response to the submission on October 2, 2017 (Dkt. No. 806), and the Court considered the matter submitted.

### MOTION TO SUPPRESS

#### Findings of Fact

During the May 24, 2017 suppression hearing, Lieutenant Brown testified that he has been employed with the Darien Police Department for seven years.  (Dkt. No. 642, pg. 6).  His job duties include observing and monitoring the day-to-day operations of the patrol division, as well as conducting road patrol in and around Interstate 95, an interstate highway that runs from the tip of Florida north to New York.  (*Id.* at 6-7).  Brown has received training in commercial and passenger drug interdiction, which teaches how vehicles are used to transport and transfer illegal narcotics, firearms and drug proceeds.  (*Id.* at 8).  Brown also completed a training course in the use of laser and radar equipment to detect speeding, and has been trained and tested in visually estimating the speed of vehicles.  (*Id.* at 9-10).  Brown is certified to handle a narcotics detection canine ("K-9"), and he has been working with a certified K-9 for the last six years while patrolling Interstate 95.  (*Id.* at 10-11).  Brown testified that the Darien Police Department considers the Interstate 95 to be a major route for the transportation of narcotics.  (*Id.* at 11).

On November 10, 2014 at approximately 5:30 p.m., Brown was patrolling the Interstate 95 between mile marker 45 and mile marker 46 and observed a red Mitsubishi traveling at a high rate of speed.  (*Id.* at 16, 22).  Using his hand-held laser device, Brown

obtained a laser count on the vehicle of 93 miles per hour, in a 70 mile per hour zone. (*Id.* at 22-23). Brown testified that the laser device is calibrated yearly, that it was in good working order that day, and that he checks the device at the beginning and end of every shift. (*Id.* at 22-23, 72-73). Dixie, Brown's certified K-9, was in the backseat of his patrol vehicle. (*Id.* at 22). Brown called dispatch and proceeded to stop the red Mitsubishi for speeding. (*Id.* at 16-17). On that date, Brown's patrol vehicle was equipped with a video and audio system which was constantly recording, but the visual recordings were preserved beginning one minute from the time an officer turns his blue lights on. (*Id.* at 13, 65). Microphones for the audio system were located on Brown's shoulder and inside the patrol vehicle, and audio was recorded from the time the blue lights were turned on. (*Id.* at 14). This equipment captured both video and audio beginning just prior to when Brown stopped the red Mitsubishi and continuing through the arrest of defendant approximately twenty-five minutes later. (*Id.* at 16). The video was entered as an exhibit at the hearing and was played during Brown's direct testimony.[2] (*Id.* at 17, Exh. 2).

Brown approached the vehicle, observed four occupants inside and detected the odor of alcohol. (*Id.* at 24, 25). Jenkins was seated in the driver's side rear passenger seat. (*Id.* at 24). Brown asked the driver, Nicholas Simmons, for his license and insurance card. (*Id.* at 24-25). Brown testified that the Simmons' actions appeared to be slow. (*Id.*). Brown directed Simmons to exit the car to determine if the smell of alcohol was emanating from him and if he was impaired. (*Id.*). Brown asked Simmons where he

---

[2] The upper-left hand corner of the video contains a date and time stamp. Brown testified that while the date stamp is accurate, the time was off by approximately an hour and four minutes, which was likely attributable to either a failure to change the time in accordance with daylight savings time changes or a dead battery. Thus, while the time stamp is not a correct reflection of the actual time of day, it is an accurate reflection as to how much time elapsed over the course of the initial stop, the search, and the arrest of defendant. Brown also testified that the laser he uses to detect speeding was not connected to the video system. (*Id.* at 19, 21).

was going, and Simmons indicated that they were traveling to Savannah, Georgia. (*Id*. at 26). Brown then informed Simmons that he was going the wrong way, and that Savannah was forty-five minutes in the opposite direction. (*Id*.). Brown also testified that Simmons' license reflected a Savannah address, and Brown found it suspicious that someone who resided in Savannah would not realize they had passed it forty-five minutes prior. (*Id*. at 27, 31). These circumstances made Brown suspect that Simmons was either under the influence or hiding something. (*Id*.). While speaking with Simmons, Brown observed Jenkins "moving around a lot" in the vehicle, and, on one occasion, place his hand outside the vehicle. (*Id*. at 29). Simmons informed Brown that he was on "felony probation for marijuana" and Brown commented that he must have had a great deal of marijuana to constitute a felony. (*Id*. at 30). Simmons then stated it was not a felony but rather a misdemeanor. (*Id*. at 31). Simmons also informed Brown that the purpose of their trip was to visit a friend in Greenville, North Carolina for approximately one hour. (*Id*. at 32). Brown found this suspicious because it is a four to five hour drive from Savannah to Greenville, and therefore irregular to travel between the two cities for an hour visit. (*Id*. at 32). Based upon his training in narcotics interdiction, Brown considered that this could be a "day trip" where "[t]hey go and conduct business – pretty much you see this in drug traffickers and money carriers and illegal – any kind of illegal activity where they go to their location, they handle their business and they turn around and come straight back." (*Id*. at 32). The video reflects that Brown instructed Simmons to exit the car approximately three minutes after the initial stop. (*See* Exh. 2).

Brown testified that after his conversation with Simmons he thought there "was possibly some kind of illegal narcotics – or illegal activity going on." (*Id*. at 32-33). Brown

6

further testified that as a result of Simmons' nervousness and the smell of alcohol, he intended to conduct a search of the passenger area of the vehicle. (*Id.* at 34). Brown indicated that "at that point also with the answers he had given me on the day turn around trip and passing Savannah when he was actually from Savannah, I also wanted to run my canine on the vehicle." (*Id.*). Brown requested back-up to help conduct the search approximately nine minutes after he stopped the vehicle. (*Id.* at 33).

Brown instructed Jenkins and the two other occupants to exit the vehicle. (*Id.* at 34). Jenkins informed Brown that there was an open container of alcohol in the car which belonged to him, and that he had a prior conviction for felony burglary. (*Id.* at 38-39). Brown testified that he asked Simmons if he "had a problem" with Brown searching the vehicle and Simmons answered "no, not really." (*Id.* at 39-40). Brown testified that he then informed Simmons "I was going to search the passenger compartment of the vehicle anyway due to the odor of alcohol emitted from within the vehicle and the fact that Mr. Jenkins had admitted to an open container being inside the vehicle, which was a violation of state law." (*Id.* at 40). Likewise, the video reflects that after Simmons answered "no, not really", Brown informed him "I was going to search it anyway."[3] (Exh. 2). Brown then instructed Simmons, Jenkins and the two female occupants of the car to stand over by the concrete barrier on the side of the highway while he conducted the search. (*Id.* at 89). Brown testified that during this time Jenkins was not free to leave, and that several times he instructed Jenkins to remain in that location for officer safety. (*Id.* at 89-90). The

---

[3] Defendant contends that the video reflects that when Brown made the statement about searching the vehicle regardless, he interrupted a statement by Simmons beginning with "but", and that this indicates that the consent was equivocal. The Court has reviewed the video and finds that while this portion of the audio is not entirely clear, it does not appear that Brown interrupted any statement by Simmons when he made the statement about searching the vehicle anyway. In addition, the Court credits Brown's testimony, which is confirmed by the video, that it was only after Simmons answered "no, not really" that he informed Simmons he had already planned to search the car.

video reflects that Brown asked for permission to search the vehicle approximately 18 minutes into the traffic stop. (*Id.* at 39-40, Exh. 2).

Brown testified that Dixie, his K-9, is trained to alert to the presence of marijuana, cocaine, heroin, methamphetamine and ecstasy, and that she indicates an alert by sitting on the ground. (*Id.* at 41). After receiving permission to search, Brown ran Dixie around the vehicle and she alerted twice, which was indicated by a sit at the driver's door and the passenger's door. (*Id.* at 41-42). Brown testified that Dixie will alert if a controlled substance is in the vehicle, or if a controlled substance had previously been in the vehicle. (*Id.* at 43). The video reflects that the alerts occurred approximately nineteen minutes and twenty seconds into the stop. (*Id.* at 42-43, Exh. 2). Brown then searched the vehicle, including the trunk area. (*Id.* at 44). While conducting the search, Brown noticed that Jenkins repeatedly rose from a seated position and was attempting to block his view of the two female occupants. (*Id.* at 45). Brown testified that in order to ensure officer safety and to prevent Jenkins from passing narcotics to another occupant of the vehicle, he repeatedly told Jenkins to remain seated. (*Id.* at 44). During the search Brown found a jacket in the trunk. (*Id.* at 44-45). Upon searching the jacket pockets, which Brown indicated that he "tends to do with clothing any time a K-9 alerts", he recovered a .380 caliber handgun. (*Id.*). Brown testified that he asked all of the vehicle occupants who the jacket belonged to, and Jenkins indicated the jacket belonged to him. (*Id.* at 45). Brown asked Jenkins if the weapon belonged to him as well, and Jenkins stated that it did. Brown then immediately arrested Jenkins. (*Id.* at 45). The video of the stop indicates that Jenkins was arrested approximately twenty-five minutes after the vehicle was initially stopped. (*Id.,* Exh. 2). Brown found open containers of alcohol in the vehicle but did not

find any illegal narcotics.  (*Id.* at 95-96).  When Brown asked one of the occupants if the beer he found on her side of the vehicle belonged to her, Jenkins interrupted and claimed responsibility for everything in the car.  (*Id.* at 46-47).

Brown wrote citations charging Jenkins with open container violations and possession of a firearm by a convicted felon, and Jenkins was transported to the jail by another officer.  (*Id.* at 50-51).  Brown also wrote Simmons a citation for speeding.  (*Id.* at 49).  Brown did not read Jenkins, or any of the occupants of the car, their *Miranda* rights prior to asking about ownership of the jacket and gun.  (*Id.* at 104).  Brown did not have any contact with Jenkins past the thirty-two minute nineteen second mark of the video. The remainder of the occupants were released approximately forty-four minutes into the initial stop, after Brown confiscated and rendered safe the gun, collected the open containers, and concluded writing the citations.  (*Id.* at 48; Exh. 2).  After having the opportunity to listen to Brown's testimony and observe his demeanor, the Court finds Brown to be wholly credible.

### *Conclusions of Law*

#### *Brown Had Probable Cause to Search.*

Defendant argues that the gun and any other evidence found on November 10, 2014 must be suppressed because the vehicle stop and subsequent search were not supported by reasonable suspicion or probable cause.  Specifically, defendant first contends that Brown did not have reasonable suspicion or probable cause to stop the vehicle for speeding, and that the detention of the occupants, including Jenkins, was unreasonably prolonged.  The Fourth Amendment protects individuals "against unreasonable searches and seizures."  *United States v. Valentine*, 539 F.3d 88, 93 (2d

Cir. 2008).  An ordinary traffic stop is a limited seizure pursuant to the Fourth Amendment.
*See United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994).  In order to justify a traffic
stop, an officer must have either "probable cause or a reasonable suspicion, based on
specific and articulable facts, of unlawful conduct."  *United States v. Gaines*, 457 F.3d
238, 243 (2d Cir. 2006); *see also United States v. Foreste*, 780 F.3d 518, 532 (2d Cir.
2015) ("Traffic stops are presumptively reasonable under the Fourth Amendment if the
officer has probable cause to believe that a traffic infraction has occurred.").  Here, Brown
credibly testified that he observed the red Mitsubishi traveling at a high rate of speed and
that he obtained a laser count on the vehicle, which indicated that it was traveling 93 miles
per hour in a 70 mile per hour speed zone.  Thus, Brown's stop of the vehicle was
supported by reasonable suspicion that the driver was speeding, and therefore
committing a traffic violation.  The Court rejects defendant's arguments regarding Brown's
ability to visually measure the speed of the vehicle and the accuracy of the laser device.
Brown credibly testified that he has been trained in, and tested on, the visual estimation
of traveling vehicles.  He further testified credibly that the laser device was in good
working order that day, that it is calibrated yearly, and that he checks the device at the
beginning and end of each shift.[4]

During a vehicle stop, an officer may ask questions of the occupants about matters
unrelated to the stop provided that the inquiries do not measurably extend the traffic stop.
*Arizona v. Johnson*, 555 U.S. 323, 333 (2009).  Moreover, "a traffic stop may be extended
for investigatory purposes if an officer develops a reasonable suspicion of criminal activity

---

[4] During the hearing, the Court denied defense counsel's request for calibration records of the laser
device used by Brown on November 10, 2014.  (Dkt. No. 643 at 117-118).  Defense counsel renewed
their request in their post-hearing brief.  The Court again denies the request and accepts the credible
testimony of Brown regarding the accuracy of the laser device.

supported by specific and articulable facts." *Foreste*, 780 F.3d at 524; *accord United States v. Glover*, 957 F.2d 1004 (2d Cir. 1992); *see also Terry v. Ohio*, 392 U.S. 1, 30 (police may seize and detain a suspect if they have reasonable suspicion that "criminal activity may be afoot."). Reasonable suspicion is "more than a hunch, but less than probable cause, and considerably less than preponderance of the evidence." *United States v. Coulombe*, 1:06-CR-343, 2007 U.S. Dist. LEXIS 86756 (NDNY Nov. 26, 2007); *accord United States v. Arvizu*, 534 U.S. 266, 273 (2002). In assessing whether reasonable suspicion exists, court are to consider the totality of the circumstances, and "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal citations omitted).

Brown credibly testified that upon approaching the car, he smelled alcohol. It was later determined that open containers of alcohol were present in the vehicle. Brown then asked the driver to step out of the vehicle to determine if he was impaired. Based upon the smell of alcohol in the car, Brown also believed that the occupants were violating open container laws. Brown credibly testified that Simmons' movements were slow, he appeared nervous, and his answers to questions were suspicious. Notably, Simmons gave confusing answers regarding his prior criminal conviction and despite having a driver's license showing a Savannah, Georgia address, did not realize that he had passed Savannah forty-five minutes prior. He also made a four to five hour trip for purposes of a one hour visit, which Brown considered consistent with "turn around trips" to conduct illegal activity or narcotics trafficking. In light of the totality of the circumstances and taking into account Brown's training and experience in drug interdiction, the Court concludes

that Brown had reasonable suspicion that criminal activity was afoot. Brown's credible testimony reflects that he suspected both violations of open container laws as well as possible narcotics trafficking or other illegal activity. Thus, he was entitled to extend the stop for investigatory purposes. *See Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000) (observing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Kendrick*, 10-CR-6096, 2015 U.S. Dist. LEXIS 64074 (WDNY May 15, 2015) (officer's observations during a traffic stop that occupants of the car were nervous, gave inconsistent answers to his questions and lacked luggage for an overnight trip supported a reasonable suspicion that criminal activity was afoot, and supported further investigation); *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) (officers had reasonable suspicion where, *inter alia*, they "noted [an] inconsistency in [defendant's] address and observed his apparent nervousness."); *United States v. Delouya*, 1:04-cr-588, 2005 U.S. Dist. LEXIS 44865 (NDNY Nov. 30, 2005) (factors that courts have traditionally cited as probative include implausible, conflicting, evasive or unresponsive answers to questions and furtive gestures or demeanor) (collecting cases). The Court rejects defendant's argument that after receiving suspicious or strange answers, Brown should have sought clarification from Simmons or the other occupants as to how long Simmons had lived in Savannah or the exact purpose of their trip to Greenville. *See United States v. Bailey*, 743 F.3d 322, 333 (2d Cir. 2014) ("The law…does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of circumstances supporting a reasonable basis to believe that criminal activity may be afoot.").

The Court also rejects defendant's argument that the investigatory stop was unreasonably prolonged and should have lasted no longer than needed for Brown to write tickets for speeding and the open container violation. An investigative detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (internal citations omitted) (although there is no outside time limitation for a permissible *Terry* stop, the length of detention may be so excessive as to convert it into an arrest). In determining whether an investigatory stop is reasonable, courts are to consider: "(1) whether the officer's actions were justified at the inception; and (2) whether police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *See Foreste*, 780 F.3d at 526; *quoting United States v. Sharpe*, 470 U.S. 675, 682 (1985). As explained above, Brown was justified in pulling over the vehicle for speeding and was further justified in extending the stop for investigatory purposes based upon reasonable suspicion of criminal activity. Brown called for back-up, ordered the other occupants out, and ran Dixie around the vehicle immediately after receiving suspicions answers from Simmons. In fact, this occurred less than twenty minutes into the traffic stop. After Dixie alerted, Brown expeditiously searched the vehicle and recovered the gun within a few minutes of searching. Indeed, the video reflects that Jenkins was arrested approximately twenty-five minutes after Brown pulled them over, and the remainder of the occupants were released approximately forty-four minutes after the initial stop. The Court concludes that in light of the totality of the circumstances, this was not an unreasonable amount of time to detain Jenkins and the other occupants. Brown made speedy and appropriate

13

inquiries in a reasonable way, and the investigation was carried out in an expeditious manner and lasted no longer than necessary to effectuate its purpose. *See Tehrani*, 49 F.3d at 61 (where "agent made speedy and appropriate inquiries in a reasonable way", Second Circuit declined to hold that "a thirty minutes detention based on reasonable suspicion [was], *per se*, too long."); *United States v. Pabon*, 1:14-cr-00049, 2015 U.S. Dist. LEXIS 69153 (D. Vt. May 26, 2015) (where officers had reasonable suspicion that occupants of car were transporting drugs, "[i]t was not unreasonable to question [the occupants], search the vehicle, and ultimately employ a drug-sniffing dog within a forty-four minute period"). Indeed, even if Brown's questioning of the occupants, use of Dixie and search of the car measurably prolonged the traffic stop, defendant's rights were not violated. During this time Brown was continuously obtaining facts independent from the speeding violation which indicated that criminal activity was afoot and required additional investigation. *See United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) (During the course of a legal investigatory stop, if the officer develops an objective and particularized basis for suspecting additional wrongdoing, he is justified in continuing the detention to investigate further.).

Defendant further argues that Brown did not have probable cause to search the vehicle, including the trunk and jacket. Pursuant to the automobile exception to the Fourth Amendment warrant requirement, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or evidence of a crime." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004). The Supreme Court has explained that "[p]robable cause exists where the facts and circumstances within [the police officers'] knowledge and of which they had reasonably

trustworthy information are sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175 (1979). As explained above, Brown had reasonable suspicion that illegal activity independent of the traffic violation was taking place, including possible narcotics violations. To that end, he was permitted to have Dixie conduct a sniff of the vehicle. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (Police may prolong an otherwise-completed traffic stop for the purpose of conducting a canine sniff of a vehicle only if there is reasonable suspicion.). Dixie alerted twice after running around the perimeter of the vehicle. In light of Brown's training and experience, his observations of Simmons' demeanor, Simmons' suspicious answers, and Dixie's alerts, Brown had probable cause to search the vehicle for contraband. *See Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013) (concluding that a trained canine's alert can provide probable cause to search an automobile); *United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) (finding that probable cause was established when drug dog "hit" on suspect's bags); *United States v. Herman*, 2:15-cr-53, 2015 U.S. Dist. LEXIS 167700 (D. Vt. Dec. 14, 2015) (after occupant voluntarily consented to the canine search and the canine alerted to the pickup truck, the officer had probable cause to search).

Moreover, "when the police possess probable cause to believe that a vehicle contains contraband, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle." *United States v. Gagnon*, 373 F.3d 230 (2d Cir. 2004) (internal citations omitted). Therefore, the scope of Brown's search permissibly extended to the trunk, the jacket in the trunk, and the interior pockets of the jacket. *See United States v. Acevedo*, 500 U.S. 565 (1991) (holding that

15

the police may conduct a warrantless search of a container in the trunk of a car if they have probable cause to believe that it holds contraband or evidence); *United States v. Pascual*, 502 Fed. Appx. 75 (2d Cir. 2012) (where probable cause existed to search the car, the permissible scope of the search included containers inside the car and the trunk); *United States v. Cuevas*, 15-cr-846, 2016 U.S. Dist. LEXIS 63009 (SDNY May 12, 2016) (the permissible scope of the search included every part of the vehicle and its contents since "the object of the search was drugs, which the defendant could have concealed in any part of the vehicle or any container therein, including a shirt pocket inside a backpack inside the trunk").

The Court rejects defendant's argument that probable cause cannot be found since Brown's questioning of Simmons and use of Dixie were essentially a "subterfuge". Defendant points to Brown's testimony, on cross-examination, that he decided to search the vehicle from the time he first approached and smelled alcohol, because he believed the occupants were violating open container laws. (Dkt. No 643, pg. 86). Indeed, while Brown may have initially intended to search the car because he smelled alcohol, his credible hearing testimony demonstrates that upon observing and questioning Simmons, a reasonable suspicion arose that the occupants were engaged in additional illegal activity, including possible narcotics trafficking. This suspicion, combined with the Dixie's two positive alerts, provided probable cause for him to search the car. Brown's subjective

intent when he first approached the car is of no consequence.[5]  *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."); *Maryland v. Macon*, 472 U.S. 463, 470 (1985) (internal citations omitted) ("Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time…and not the officer's actual state of mind at the time the challenged action was taken.").

Defendant also contends that it was unreasonable for Brown to rely on Dixie's alert in determining whether there was probable cause to search the vehicle.  At the conclusion of the suppression hearing, the Court instructed the Government to provide Dixie's certification records.  The Government submitted Dixie's accreditation by the North American Police Work Dog Association dated August 30, 2011 and Dixie's Narcotics Certificates of Certification from the National Police Canine Association dated May 8, 2012, January 3, 2013, February 9, 2014, January 20, 2015 and February 9, 2016.  (Dkt. No. 643, Gov. Exh. 8[6]).  On September 15, 2017, in accordance with this Court's instructions following oral argument on the motion to suppress, the Government submitted an affidavit by Brown addressing Dixie's performance in the field as well as during controlled training exercises.  (Dkt. No. 788).  Therein, Brown explained that the

---

[5] Likewise, the Court rejects defendant's argument that Brown's incorrect statement, during the hearing, that an open container violation constitutes a misdemeanor under Georgia law demonstrates either his lack of credibility or his lack of probable cause to search the vehicle.  The Court had an opportunity to observe Brown's demeanor during his testimony.  The Court finds that his incorrect statement as to the punishment for an open container violation was a mistaken understating of the law and did not demonstrate bad faith or purposeful deception.  Indeed, the Court concludes that Brown was a credible witness.  The Court also concludes that any mistake Brown made regarding the consequences of an open container violation at the time of the search does not negate probable cause, which existed for the myriad of reasons discussed *infra.*

[6] After the hearing, the Government provided the certification records to the Court and defense counsel. The Court admits the records as Government Exhibit 8 to the hearing transcript.

Darien Police Department does not make or keep canine field performance records in the ordinary course of business. (*Id.* at pg. 3). However, Brown has, on occasion, kept hand-written notes regarding Dixie's field sniffs, controlled training exercises, and certification examinations. (*Id.*). The Government provided the hand-written notes drafted between August of 2014 and January 2016, as well as Brown's explanation of those notes. With respect to Dixie's field performance, Brown described five instances where Dixie alerted to the presence of a controlled substance and Brown subsequently performed a search. (*Id.*). On two of those occasions Brown uncovered a controlled substance in the course of his search, and on three occasions he did not. (*Id.*). Brown indicated that based upon his training and experience, he is aware that "even when Dixie provides a positive alert to the presence of an odor of a controlled substance, the actual substance may not be present." (*Id.*). Brown also described Dixie's performance in eleven training exercises and one certification. (*Id.*). Brown avers that but for one instance of handler error during a certification, one instance of examiner error during a training, and one instance where Dixie alerted to a cabinet next to the desk instead of the desk itself, Dixie tested at 100% accuracy in all controlled training or certification situations. (*Id.*).

In response to the Government's submission, defendant contends that the Darien Police Department's lack of field records prevents the Government from establishing Dixie's reliability. Defendant also points to the fact that in three out of the five instances where Dixie alerted in the field, controlled substances were not found. The Court rejects these arguments. In *Florida v. Harris*, the Supreme Court held that requiring records of a dog's field performance in order to make a probable cause determination was reversible error because "in most cases they have relatively little import." 568 U.S. 237, 245 (2013).

The Supreme Court went on to explain, in detail, the especially limited value of field records in evaluating the reliability of a canine sniff.

> Errors may abound in [field] records. If a dog on patrol fails to alert to a car containing drugs, the mistake will usually go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings…The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

*Id.* at 245-46. The *Harris* Court concluded that, for these reasons, evidence of a dog's satisfactory performance in a certification or training program "can itself provide sufficient reason to trust his alert." *Id.* at 246-247 ("if a bona fide organization has certified a dog after his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."). Here, the Government has provided evidence that Dixie was certified by a bona fide organization and that she has a highly successful record in training and certification exercises. Contrary to defendant's argument that they have not been provided with information as to how the training and certification was conducted, Brown's affidavit describes numerous training exercises and one certification procedure. Indeed, Brown explains where the trainings took place, the manner in which the tests were conducted, what substances Dixie alerted to and how often, and instances where she correctly did not alert when a controlled substance was not present. The record also contains proof that Dixie was repeatedly certified by the National Police Canine Association and the North American

Police Work Dog Association.  Finally, Brown's assessment that Dixie may provide a positive alert even when a controlled substance is not present comports with the Supreme Court's description of false positives due to residual odors.  In light of this evidence, the Court concludes that neither the lack of field records nor the handwritten notes of the three false positives demonstrate that it was unreasonable to rely on Dixie's alert. Moreover, based upon the proof in the record regarding Dixie's certifications and her performance in training and certification exercises, the Court concludes that it is not necessary to reopen the hearing.  *See United States v. Cordero*, 5:13-cr-166; 2014 U.S. Dist. LEXIS 95227 (D. Vt. 2014) (where government submitted evidence of canine's certification and ongoing training and defendant did not identify any evidence which would call into question the canine's reliability, the officer had probable cause to search the defendant's truck based upon the canine's alert).  For all of the reasons stated above, the Court finds that Brown had probable cause to search Simmons' vehicle on November 10, 2014.[7]

### *Simmons Consented to the Search.*

The Court further finds, based upon the video of the stop and the hearing testimony, that the search of the vehicle was valid because Simmons provided consent. A warrantless search is reasonable if it is based on voluntary consent by an authorized individual.  *See Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991).  Voluntariness is to be determined based upon the totality of the circumstances, and the "government must prove by a preponderance of the evidence that he who consented made a free and

---

[7] Given the Court's findings that Brown had probable cause to search the vehicle, including the jacket and trunk, the Court need not reach the parties' arguments as to whether Jenkins had a reasonable expectation of privacy as to the trunk of the vehicle and his jacket contained therein.

unconstrained choice and did not simply acquiescence to a show of authority." *United States v. Columbre*, 1:06-CR-343, 2007 U.S. Dist. LEXIS 86756 (NDNY Nov 26, 2007); *accord United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). In analyzing the totality of the circumstances, a number of factors are relevant. These generally include such considerations as age, education, background, physical and mental condition, as well as the setting is which the consent is obtained. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as "the sine qua non of an effective consent." *Schneckloth*, 412 U.S. at 234.

Here, Brown credibly testified that he asked Simmons if he had a problem with Brown searching the car and that Simmons answered, "no, not really." The record reflects that Simmons, an adult male, did not suffer from any physical or mental disabilities, was not impaired and had some familiarity with the criminal justice system. At the time Brown requested consent to search, they were on a public highway, Simmons was not handcuffed or physically restrained in any way, and there had been no show of physical force or brandishing of weapons by the officers. *United States v. Hernandez,* 5 F.3d 628 (2d Cir. 1993) (district court's finding of consent to search upheld on appeal where facts introduced at the hearing indicated that defendant was not under arrest at the time he consented to a search of the vehicle, officers did not prolong pre-search questioning, and there was no indication that his background or education tainted his consent); *United States v. Zaleski*, 559 F. Supp. 2d 178, 186-87 (D. Conn. 2008) (concluding that the surrounding circumstances were not sufficiently coercive as to render consent to search involuntary where defendant "was not handcuffed prior to giving consent[,]" and the

"officers did not draw their guns . . . [or] make any threats or use physical force."); *United States v. Delille*, 2:15-cr-88, 2016 U.S. Dist. LEXIS 5886 (D. Vt. Jan. 19, 2016) (consent to search vehicle was voluntary where defendant was "on a public highway in plain view of passerby", officers did not make any show of force, and defendant was not subject to physical restraint before signing consent card).

The Court further finds that Brown's statement that he was going to search the vehicle anyway because of the smell of alcohol did not render Simmons' consent involuntary. To begin, the video and Brown's credible testimony both reflect that it was only *after* Brown asked for consent to search and Simmons granted consent that Brown stated he had intended to search the vehicle regardless. Moreover, the Court finds that the situation here is akin to cases where an officer informs a defendant, in good faith, that a search warrant will be sought and likely obtained in the absence of consent. To that end, the Second Circuit has held that an officer's statement of his ability or intent to obtain a search warrant does not negate voluntariness of consent if there is a good faith belief that a warrant will be obtained. *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983); *see also United States v. Lace*, 669 F.2d 46, 52 (2d Cir. 1982) ("In the absence of any deception, coercion, or other overreaching on the part of the police, [defendant's] belief in the inevitability of a search warrant, a justifiable belief under the circumstances, did not preclude a finding that his consent was voluntary."); *United States v. Faruolo*, 506 F.2d 490, 494 (2d Cir. 1974) ("The district court found that [the officer's] advice was well grounded. There was no deceit or trickery. The Court below found that there was not only sufficient basis for his communicated belief but that in fact there were grounds for issuance of a search warrant."). This case admittedly does not involve conversations

about obtaining a search warrant. However, Brown's credible hearing testimony reflects that at the time he told Simmons that he planned to search the car anyway, Brown had a good faith belief that there was probable cause to search because of open container law violations. Thus, the statement, made after consent had been obtained, was not an attempt to deceive or trick Simmons into acquiescing to the search.

### Jenkins Was Not in Custody at Time of Statements.

Finally, defendant argues that any statements he made to Brown on November 10, 2014 regarding ownership of the jacket and the gun, as well as any other inculpatory statements, should be suppressed because he was in custody and had not been provided with *Miranda* warnings. A suspect in custody must receive certain warnings before he or she can be subjected to interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966). While a defendant is not ordinarily free to leave and thus seized for Fourth Amendment purposes during a traffic stop, courts have routinely held that ordinary roadside stops generally do not require the administration of *Miranda* warnings. *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (holding that "persons temporarily detained pursuant to [traffic] stops are not 'in custody' for the purposes of *Miranda*"). Indeed, the Second Circuit has explained that "the overarching custody question is whether a reasonable [person] in the suspect's position would have understood [himself] to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. FNU LNU,* 653 F.3d 144 (2d Cir. 2011).

The Court concludes that at the time Jenkins made statements about owning the jacket and gun, a reasonable person would not have understood himself to be restrained in a manner comparable to a formal arrest. To begin, the exchange between Brown and

defendant took place on a public highway rather than in a police station or cruiser. Jenkins was standing on the side of the road with the other occupants and was not physically restrained in any manner.  The video reflects that Jenkins' interactions with Brown had been cordial and non-confrontational, and the video further demonstrates that Jenkins was engaged in what appears to be cordial conversation with the other officer prior to and during the search.  While Brown directed Jenkins to stay put while he conducted the search, he did not restrain or handcuff Jenkins.   Brown's question regarding ownership of the jacket was directed at all of the occupants, and Jenkins immediately volunteered that it belonged to him.  Brown then asked Jenkins about the gun in the jacket pocket and Jenkins immediately stated that it was his.  It was not until after he made these statements that Brown placed Jenkins under arrest.  Indeed, after Brown asked another occupant of the car about an open container, Jenkins volunteered that everything in the vehicle belonged to him.  Jenkins actions, considered in their totality, do not reflect that a reasonable person would have believed they were under restraint commiserate with a formal arrest at the time they made the inculpatory statements at issue here.  *See United States v. Chin*, 5:13-cr-28, 2013 U.S. Dist. LEXIS 138101 (D. Vt. Sept. 26, 2013) (defendant was not in custody for purposes of *Miranda r*equirements during a vehicle stop and search where he "was asked only a few questions in a public location with access to his traveling companions and passersby", he was not handcuffed or placed in physical restraints, officers did not draw their weapons, and he was not told he was under arrest); *United States v. Santillian*, 13 Cr. 138, 2013 U.S. Dist. LEXIS 111376 (SDNY Aug. 7, 2013) (pre-arrest statements of motorists not suppressed for lack of *Miranda* warnings where traffic stop was lawful, neither motorist was placed in

handcuffs or under arrest during the roadside questioning, the questioning occurred on a public highway, and the officers did not brandish weapons during the stop).

For these reasons, it is recommended that defendant's motion to suppress evidence and statements resulting from the vehicle stop on November 10, 2014 be denied in its entirety.

### *OMNIBUS DISCOVERY DEMANDS*

#### *Motion to Suppress Pre-Trial Identification of Jenkins*

Defendant moves to suppress pre-trial identification of him from photo arrays, or, in the alternative, a *Wade* hearing addressing the suggestiveness of the photo-arrays. Three witnesses were shown photo arrays of defendant prior to providing testimony during defendant's Niagara County Court murder trial. One witness selected the photo of Jenkins but knew him only by nickname, a second witness identified Jenkins as being the person they "think they saw"; and a third witness identified Jenkins' picture and stated he knew him as "little Bear".

A trial witness may identify a defendant if: (1) an out-of-court identification procedure was not improperly suggestive; or (2) the in-court identification is grounded on "an independent basis in memory." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir. 1977). When a witness has made a pretrial identification, a challenge to that identification and to an in-court identification of the defendant at trial triggers "a one-step or two-step inquiry." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). The first step is to determine whether the identification procedures were unnecessarily suggestive. *Id.* If they were not, the challenge is denied and the reliability of the identification is left for the jury's determination. *See Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986). If the

procedures were unnecessarily suggestive, the second step is to determine whether the identification is nevertheless admissible because "it is independently reliable rather than the product of the earlier suggestive procedure." *Maldonado-Rivera*, 922 F.2d at 973. Courts have denied *Wade* hearings where a defendant has made only conclusory or unsupported assertions of suggestiveness. *See United States v. Berganza*, 03 CR. 987, 2005 U.S. Dist. LEXIS 2203 (SDNY Feb. 16, 2005) ("A defendant may not baldly request a *Wade* hearing; rather he must allege facts supporting his contention that the identification procedures used were impermissibly suggestive.").

Here, defendant argues that the photo arrays were unduly suggestive in that Jenkins' picture "stands out" because "the depiction of his hairline is so different from those in the other five photographs." The Court has viewed the photo arrays and finds there to be insufficient indicia of suggestiveness to warrant a hearing. (Dkt. No. 554-7, Exh. G). Indeed, the depiction of defendant's hairline in the photo arrays is similar to other photos presented, and defendant's photo does not "stand out" from the others on this basis. (*Id.* at pgs. 2, 5, 7). *See United States v. Hamideh*, 00 CR. 950, 2001 U.S. Dist. LEXIS 22, (SDNY Jan. 3, 2001) ("The only distinguishing characteristic is that defendant is smiling in his photo, while the other five individuals are not. This single difference cannot support even the threshold showing of suggestiveness that would require a hearing."). The Court further notes that the Niagara County Court held a *Wade* hearing regarding the three photo arrays, and a review of the transcripts from that proceeding indicates that the arrays were not unduly suggestive. (Dkt. No. 554-5, Exh. E). Indeed, the three witnesses subsequently identified Jenkins during the state murder trial. (Dkt. No. 643, pg. 121). Finally, any arguments that the identifications were faulty

because the witnesses called the defendant by the wrong name, knew him only by his nickname or were equivocal in their identification are appropriate subjects for cross-examination rather than a pre-trial hearing. *See United States v. Ruggeriero*, 824 F. Supp. 379, 396 (SDNY 1993) (pretrial determination of witness identification procedures not needed where defendants' due process rights and the reliability of the identification evidence could be ensured through the "time-honored process of cross-examination…the device best suited to determine the trustworthiness of testimonial evidence.").

Further, even if the Court were to determine that the identification procedures were unduly suggestive, there is evidence in the record that the identifications are independently reliable. The information proffered by the Government suggests that at least two of the witnesses who identified defendant during the state court trial knew and interacted with Jenkins prior to identifying him in the photo arrays. Indeed, the Government suggests that much of the identification testimony will be elicited from cooperating witnesses who knew, and previously interacted with, Jenkins. *See Johnson v. Walker,* CV-01-6862, 2003 U.S. Dist. LEXIS 14628 (EDNY Aug, 25, 2003) ("[T]he fact that [the defendant] was known to the eyewitness and was not a stranger is itself compelling evidence of an independent source for the identification."); *United States v. Shakur*, 82 Cr. 312-CSH, 1987 U.S. Dist. LEXIS 47 (SDNY Jan. 9, 1987) (denying request for *Wade* hearing relating to photographic identifications by witnesses who had "extensive, personal contacts with [defendant] in both licit and illicit activities"). Thus, it is foreseeable that the witnesses' ability to identify Jenkins will not be a disputed issue at trial. Should the issue arise, the trial court would have the opportunity to *voir dire* the witnesses outside the presence of the jury as to their basis of knowledge of defendant.

In light of the above, the Court concludes that there is no basis for conducting *Wade* hearings at this time. However, Government witnesses and summaries of anticipated testimony have not yet been disclosed. When this information is provided, the trial court will be in a better position to determine if a *Wade* hearing or *voir dire* outside the presence of the jury are necessary. Therefore, the Court denies defendant's request without prejudice for renewal before the District Court.

### *Rule 16*

Defendant moves for discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, which requires that the Government disclose evidence and information upon request of the defendant. While Rule 16 was intended to provide for liberal discovery, a defendant is not entitled to discovery of "the entirety of the government's case against him." *United States v. Percevault,* 490 F.2d 126, 130 (2d Cir. 1974). Rule 16 provides that a defendant is entitled to the following: (1) a defendant's written, recorded or oral statements in the possession of the government; (2) the defendant's prior record; (3) documents, objects, books, papers, photographs, etc. that will be used during the government's case-in-chief; (4) reports of examinations or tests; (5) and information about expert witnesses in accordance with Federal Rules of Evidence 702, 703 and 705. *See* Fed. R. Crim. P. 16(a)(1). Rule 16 specifically exempts from disclosure "reports, memorandum, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." *See* Fed. R. Crim. P. 16(a)(2).

Here, the Government indicates that it has and will continue to comply with Rule 16. Specifically, the Government has provided surveillance reports, photographs, search

warrants and returns, laboratory reports, FBI 302's, police reports, transcripts, photographs, statements of co-defendants, redacted witness statements, photo array identification, crime scene reports, ballistic reports, Facebook photos, jail recordings, CAD reports, and 911 calls and radio transmissions. The Government further states that all physical evidence recovered during the investigation has been made available for inspection by defendant's attorney. With respect to scientific tests and reports pursuant to Rule 16(a)(1)(F), the Government has provided forensic or laboratory reports in its possession and states that it will provide any additional reports upon receipt. The Government further responds that, in accordance with Rule 16, Federal Rules of Evidence 702, 703, and 705, and the District Court's pretrial order, it will disclose the names of potential expert witnesses, the contents of their reports, a list of their credentials and qualifications, the methods used to support their opinion and a summary of their anticipated testimony.

Based upon the representations made by the Government including that it will continue to provide discoverable evidence as it becomes available, the Court finds that it is in compliance with Rule 16. The Court therefore denies defendant's Rule 16 motion as moot. The Government is reminded that its disclosure obligations continue up through and during trial. *See* Fed. R. Crim. P. 16(c).

### *Rule 12*

Defendant moves, pursuant to Federal Rule of Criminal Procedure 12(b)(4)(B), for notice of the Government's intent to use, in their case-in-chief at trial, any evidence that defendants may be entitled to pursuant to Rule 16. The Government has noticed defendant that it intends to use, during its case-in-chief, all items, information or

documents that defendant has been provided or made aware of.  Defendant's Rule 12(b)(4)(B) motion is denied as moot, and the Government should continue to comply with Rule 12 if and when new evidence becomes available and is anticipated to be used at trial.

### Brady Material

Defendant moves for immediate disclosure of exculpatory information and impeachment material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1986) and *Giglio v. United States*, 405 U.S. 150 (1972).  The Government states that it is mindful of its obligations under *Brady*, that it has complied with those obligations, and that to the extent materially exculpatory and impeachment information exists or becomes known to the Government, that information will be provided to defendant in advance of proof during trial.[8]

This Court's prior Decision and Order contained an extensive discussion and ruling as to the production of *Brady/Giglio* materials in this case.  (*See* Dkt. No. 568, pgs. 8-13).  The determinations therein were affirmed by the District Court on August 2, 2017.  (*See* Dkt. No. 708).  For the reasons set forth in the Court's prior Decision and Order, and because of the Government's representations regarding *Brady* material as it pertains to Jenkins, defendant's motion for disclosure of exculpatory material is denied as moot.  The Government is reminded of its continuing obligations to comply with the requirements of *Brady* and *Giglio*.

---

[8] In its response to defendant's omnibus demands, the Government states that it is unaware of any *Brady* material specifically related to Jenkins.

_Disclosure of Government Witnesses, Witness Statements and Informants_

Defendant moves for disclosure of the identities of all informants who: (1) possess information material to his guilt or innocence; or (2) were present at the events described in the Indictment. Defendant also moves for disclosure of any Government reports containing material information from informants, and pretrial access to all Government trial witnesses. Defendant requests disclosure of witness statements no later than six weeks prior to trial. The Government objects to providing the identities of informants or non-testifying witnesses, and states that it will comply with its standard practice of disclosing its witnesses and their prior statements in advance of trial.

There is no obligation that the Government produce the statements of individuals who are not testifying at trial. _See United States v. Rigas_, 583 F.3d 108, 125-26 (2d Cir. 2009). In addition, the Government has a qualified privilege to withhold information concerning the names of confidential informants that it does not intend to call as witnesses. _See Rovario v. United States_, 353 U.S. 53, 60-61 (1957) (the purpose of the privilege is to encourage citizens to report criminal activity). The informant's privilege must give way, however, if disclosure is essential to a defense or the fair determination of the case. _United States v. Lilla_, 699 F.2d 99, 105 (2d Cir. 1983). To that end, a defendant seeking the identity of a confidential informant must make some evidentiary showing as to why disclosure is significant to determining defendant's guilt or innocence. _United States v. Jimenez_, 789 F.2d 167, 170 (2d Cir. 1986) (explaining that defendants face a "heavy burden" of establishing that disclosure is essential to the defense); _Lilla_, 699 F.2d at 105 ("this requires some demonstration that in the absence of such disclosure the defendant will be denied a fair trial"); _United States v. Valenzuela-Bernal_, 458 U.S.

858, 871 (1982) (defendant need not show that the informant's testimony would actually be helpful to the defense, but instead "the events to which a witness might testify, and the relevance of those events to the crime charged").

Jenkins has not provided any specific reasons as to why informant identities are material or necessary to his defense. He does not offer an explanation of what the informants might testify about, nor does he establish its relevance to the crimes charged here. Instead, defendant generally states that because this case involves an alleged conspiracy, such information would be relevant and helpful. This is insufficient to meet the burden. If and when the informants are to be called as witnesses at trial, defendant will have access to their identities as well as all relevant impeachment material and prior statements. In addition, if the informants reveal exculpatory information at any time, the Government has an ongoing duty to disclose this information.[9] Thus, the Court finds that no prejudice will inure to defendant in continuing to protect the identity of informants at this time. Defendant's motion for disclosure of informant identities is denied without prejudice to defendant's ability to make a further request if additional, relevant information becomes available.

The Government has no general duty to disclose the identities of its witnesses before trial. *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990). Section 3500 of Title 18 of the United States Code requires that the government, on motion of defendant, disclose a government witness's prior statements that are in the government's possession

---

[9] For the same reasons that defendant is not entitled to the identities of informants, defendant is not generally entitled to Government reports containing information received from informants. Therefore, the Court denies defendant's request that the Court review such reports *in camera* or make them a portion of the record under seal. However, the Court notes that in the event such a report or statement contains exculpatory information or information that would impeach the credibility of Government witnesses, that material is subject to disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

and relate to the subject matter of the witness's direct testimony ("3500 material"). *See also Jencks v. United States*, 353 U.S. 657 (1957); Fed. R. Crim. P. 26.2 (procedure for producing a witness statement). A witness statement is defined as: (1) a written statement by a witness that is signed or otherwise adopted or approved by the witness; (2) a substantially verbatim recording or transcription of a witness's oral statement; or (3) any statement however taken or recorded made by the witness to the grand jury. 18 U.S.C. 3500(e). Statements are not required to be produced, by law, until after the witness has testified on direct examination, and the Court cannot mandate that they be produced sooner. *See* 18 U.S.C. §3500(a); Fed. R. Crim. P 26.2(a).

Here, the Government indicates that, prior to trial and in accordance with the District Judge's pretrial order, it will provide a witness list and a summary of each witness's anticipated testimony. The Government will also provide 3500 (*Jencks*) material as to each witness including FBI 302's, other law enforcement reports and grand jury transcripts. The Government also intends to disclose, at that time, witness impeachment information such as criminal histories, plea agreements, cooperation agreements, proffer agreements and any other related material or documents. The Government has indicated that it is working with defense counsel to formulate protective orders, and will disclose 3500 material expeditiously and in advance of trial. Therefore, defendant's motion for disclosure of trial witnesses and their statements is denied as moot. While the Court cannot require the Government to disclose 3500 material at a certain time in advance of trial, the Government is encouraged to provide 3500 material as soon as practicable, in order to prevent delays at or immediately prior to trial.

### Co-Conspirator Statements and Conspiracy Hearing

Defendant moves, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), to "bar the admission into evidence of all post-arrest statements by non-testifying co-conspirators, co-defendants which may implicate him in any way."  Defendant also requests that the Court "order the Government to turn over to the defense copies of all statements attributable to any other defendant which were made during the course of or in furtherance of any conspiracy or charges, as well as all post-arrest statements by any co-conspirators/co-defendants whether testifying or not, which may implicate Mr. Jenkins in any way."  Defendant further requests a pretrial hearing to address the foundation of any co-conspirator statements the Government seeks to introduce at trial pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence.

Rule 16 of the Federal Rules of Criminal Procedure does not provide for the disclosure of co-conspirator statements.  To the extent that the statements in question constitute either 3500, *Giglio*, or *Brady* material, those statements are to be disclosed consistent with the applicable statutes and procedures. Federal Rule of Evidence 801(d)(2)(E) excludes, from the hearsay prohibition, out-of-court co-conspirator statements made during the course of and in furtherance of a conspiracy.  Rule 801(d)(2)(E) does not contain a requirement as to pretrial notice of statements, and the admissibility of any such statements, all well as any *Bruton* implications, are best addressed by the trial court.  To that end, the Government states that it will proffer evidence in support of the admission of out–of–court co-conspirator statements at the time designated by the trial court.  Therefore, defendant's motion for disclosure of co-conspirator statements and a conspiracy hearing is denied, without prejudice for

defendant to renew the requests before Judge Wolford.  *See United States v. Anguiera*, 11-CR-116(S); 2012 U.S. Dist. LEXIS 51862 (WDNY April 12, 2012) (Scott, M.J.) ("[T]he relief sought for excluding non-testifying co-conspirator statements...[is] better considered by the District Judge prior to trial and are deferred for that consideration.").

### *Disclosure of Evidence Pursuant to Rules 404(b), 608 and 609*

Defendant moves for disclosure of any evidence of prior crimes or bad acts the Government intends to introduce at trial pursuant to Federal Rule of Evidence 404(b). Defendant also moves for pretrial disclosure of impeachment evidence pursuant to Federal Rules of Evidence 608 and 609.  The Government responds that it will disclose this evidence, if it exists, at the time it is required to do so by the trial court.

The Government is required to provide "reasonable notice in advance of trial" of the general nature of prior uncharged crimes or bad acts it intends to introduce against a defendant.  *See* Fed. R. Evid. 404(b).   Rule 608 of the Federal Rules of Evidence does not contain the same pretrial notice requirement.   Based upon the Government's representation that it will disclose Rule 404(b) and impeachment evidence at the time it is required to do so by the District Court, defendant's motion is denied as moot.  The issue of admissibility of such evidence is left to the determination of Judge Wolford at the time of trial.

### *Preservation of Rough Notes and Other Evidence*

Defendant moves for an order requiring all government agents and officers who participated in the investigation to retain and preserve all rough notes taken as part of their investigation, regardless of whether they were incorporated into a formal report.  The Government indicates that it has instructed agents to incorporate all notes into formal

reports, and that it has already provided defendant with some reports and investigative notes.  The Court grants defendant's motion and directs the Government to arrange for the preservation of all rough notes and related information pending further instruction from Judge Wolford at trial.

### Motion for Grand Jury Transcripts

Defendant requests production of grand jury transcripts and minutes because he is the subject of a "bare bones Indictment" and has no information as to the witnesses or evidence against him.  The Government previously indicated that Jenkins did not testify before the grand jury, and that it will disclose any grand jury testimony that constitutes 3500, *Brady* or *Giglio* material.  Notwithstanding this material, a defendant is not entitled to inspect grand jury minutes and evidence without producing "concrete allegations of government misconduct."  *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994). Defendant has not made any such allegations here.  Therefore, to the extent that defendant requests grand jury material that is not also 3500, *Brady* or *Giglio* material, the request is denied.

### Motion to Voir Dire Government Experts

Defendant moves to *voir dire* Government experts outside the presence of the jury. This request is premature since expert disclosures have not yet been exchanged.  In addition, the determination as to the proper manner to *voir dire* experts should be deferred to the District Judge, who will make a determination as to the admissibility of such evidence at trial.  Therefore, defendant's motion is denied as moot without prejudice for renewal before Judge Wolford.

*Motion for Audibility Hearing*

Defendant moves for the right to ask the Court to hold an audibility hearing for any recordings the Government seeks to introduce at trial. The Government states that it has or will make available all recordings of intercepted conversations of defendant. Defendant has not alleged that any specific recordings are inaudible. Therefore, defendant's motion is denied as premature and may be revisited when defendant identifies the specific recordings that necessitate a hearing.

*Motion to Strike Language from Indictment*

Defendant moves to join defendant Scanlon and defendant Enix's previous motion to strike paragraphs 2 through 24 of Count 1 (RICO conspiracy) as irrelevant, inflammatory and prejudicial. In the April 25, 2017 Decision and Order, this Court found no basis to strike paragraphs 2 through 24 of the Indictment. However, the Court noted that the trial court is in the best position to make a final determination as to whether the Indictment, or portions thereof, should be submitted to the jury. Therefore, for the reasons stated in this Court's prior Decision and Order (Dkt. No. 568, pgs. 20-23), the motion to strike paragraphs 2 through 24 of Count 1 is denied without prejudice to its renewal before Judge Wolford.

Defendant also moves to strike, from the Indictment, the Notice of Special Sentencing Factors with Respect to Count 1 and the Notice of Special Findings for Andre Jenkins a/k/a Little Bear. (Dkt. No. 33, pgs. 29, 71-72). The Notice of Special Sentencing Factors indicates that defendant's alleged racketeering activity includes the murders of Maue and Szymanski. Because a finding that defendant engaged in this activity could increase the potential penalty over and above the statutory maximum should he be

37

convicted of Count 1, this notice was properly included in the Indictment.  *See Apprendi v. New Jersey*, 430 U.S. 466 (2000) ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt.")  Therefore, defendant's motion to strike the Notice of Special Sentencing Factors with Respect to Count 1 is denied.  It is the province of the District Court, at trial, to determine how the jury will be presented with and instructed as to the *Apprendi* factors.  As to the Notice of Special Findings, the Government is no longer seeking the death penalty in this case, and therefore defendant's motion to strike this portion of the Indictment is denied as moot.

*Motion for Joinder and Leave to File Additional Motions*

Defendant moves to join in all motions filed by his co-defendants, to the extent that they are applicable to him.  The Court grants defendant's requests and finds that to the extent the Court has already rendered decisions or recommendations on motions by co-defendants which are applicable to Jenkins, those decisions and recommendations apply equally to Jenkins.

Defendant also moves to preserve his right to file additional motions or supplement the instant motions.  To the extent that defendant intends to bring motions based upon new information or evidence that has not yet been disclosed, his request for leave to file additional motions is granted.  To the extent that defendant intends to bring motions concerning issues that could have been raised prior to the previous motion deadline, defendant's request is denied without prejudice to bring the motion upon a showing of good cause for the untimely filing.

*Reciprocal Discovery*

The Government moves for reciprocal discovery pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.  The Government requests that it be permitted: (1) to inspect and copy books, papers, documents, photographs, tangible objects, or copies of portions thereof which are in the possession, custody or control of any defendant and which that defendant intends to introduce as evidence at trial; (2) to inspect and copy any results or reports of physical or mental examinations and/or of scientific tests or experiments made in connection with this case within the possession or control of any defendant which that defendant intends to introduce as evidence at trial or which was prepared by a witness whom the defendant intends to call at the trial when the results or tests relate to that testimony; and (3) advance disclosure of any statements the defendant proposes to utilize at trial pursuant to Rule 807 of the Federal Rules of Evidence.  The Government's request for reciprocal discovery is granted.

## CONCLUSION

For the foregoing reasons, it is recommended that defendant Andre Jenkins' motion to suppress evidence and statements (Dkt. No. 522) be denied.  It is ordered that Defendant Jenkins' omnibus discovery demands (Dkt. No. 522) are decided in the manner detailed above.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to the recommendations portion of this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in

accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Wolford.

**Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.** See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED**.

Dated: October 23, 2017
      Buffalo, New York

/s/ Michael J. Roemer
MICHAEL J. ROEMER
United States Magistrate Judge