UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.

ANDRE JENKINS a/k/a Little Bear,

         Defendant.
_____

**DECISION AND ORDER**

1:15-CR-00142 EAW

UNITED STATES DISTRICT COURT
FILED
JAN 0 8 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

## **INTRODUCTION**

Defendant Andre Jenkins ("Defendant") has filed objections (Dkt. 860) to an Amended Report and Recommendation of United States Magistrate Judge Roemer dated October 23, 2017 (Dkt. 832), recommending that this Court deny Defendant's motion to suppress statements and evidence obtained on November 10, 2014. Based upon this Court's *de novo* review, including conducting a reopened suppression hearing, the Court denies Defendant's motion to suppress (Dkt. 522) for the reasons discussed below.

## **PROCEDURAL BACKGROUND**

Defendant is charged, along with eight remaining defendants, in nine counts of a 46-count Second Superseding Indictment that alleges various crimes, including a RICO conspiracy in violation of 18 U.S.C. § 1962(d), pertaining to the operation of the Kingsmen Motorcycle Club. (Dkt. 33). On March 7, 2017, Defendant filed a pretrial motion seeking various forms of relief, including suppression of statements and physical evidence obtained on November 10, 2014, during a traffic stop of a vehicle in which Defendant was a passenger, near Darien, Georgia. (Dkt. 522 at ¶¶ 48-78; Dkt. 522-1). The Government

opposed Defendant's suppression motion (Dkt. 554 at 15-30), and Defendant submitted a reply memorandum in further support of the motion (Dkt. 575 at 2-7). The resolution of Defendant's suppression motion was referred to Magistrate Judge Roemer pursuant to 28 U.S.C. § 636(b)(1)(A). (Dkt. 35). The Magistrate Judge concluded that a hearing should go forward to address Defendant's motion to suppress (Dkt. 577), and a suppression hearing was held on May 24, 2017, at which time Lieutenant Anthony Brown from the Darien (Georgia) Police Department testified (Dkt. 643).

The Government submitted a post-suppression hearing brief on August 7, 2017 (Dkt. 720), and Defendant submitted a post-hearing memorandum in further support of his motion to suppress on August 8, 2017 (Dkt. 722). The Government then submitted a reply brief on August 21, 2017 (Dkt. 742), and Defendant submitted a reply on August 22, 2017 (Dkt. 747). Among other arguments, Defendant contended that he was entitled to various discovery concerning the training and certification of the narcotics detention canine— "Dixie"—utilized during the traffic stop. Oral argument was held before Judge Roemer on August 25, 2017 (Dkt. 759), at which time Defendant's request for Dixie's field performance records was granted, but his request for calibration records related to the Lidar device used to measure speed on November 10, 2014, was denied (Dkt. 832 at 3-4, 10 n.4). On September 15, 2017, the Government filed a supplementary submission concerning Dixie's field performance records. (Dkt. 788). Defendant submitted a reply to that supplemental submission on October 3, 2017, and sought to reopen the evidentiary hearing and obtain additional disclosure. (Dkt. 806).

On October 20, 2017, Judge Roemer filed his Report and Recommendation with respect to the suppression motion, and then, on October 23, 2017, he filed an amended Report and Recommendation (hereinafter, the "R&R"). (Dkt. 832). Defendant filed objections to the R&R on November 9, 2017. (Dkt. 860). The Government filed its response to the objections on November 27, 2017. (Dkt. 885). Oral argument was held before the undersigned on November 29, 2017 (Dkt. 894), at which time the Court granted Defendant's request to reopen the suppression hearing and required the Government to provide additional discovery concerning Dixie, as well as the Lidar device utilized during the traffic stop. (Dkt. 889). The reopened suppression hearing took place before the undersigned on December 12, 2017, at which time Lieutenant Brown testified and additional exhibits were entered into evidence. (Dkt. 943; Dkt. 951). Thereafter, both the Government and Defendant filed post-hearing memoranda in support of their respective positions. (Dkt. 961; Dkt. 962).

## STANDARD OF REVIEW

A district court reviews a report and recommendation to which a party has timely[1] objected under a *de novo* standard. Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) (requiring a district

---

[1]     Defendant's objections were not timely filed. However, the Government has not raised any objection with respect to the timeliness of Defendant's objections. This Court will accept the objections and grant a *nunc pro tunc* extension of time with respect to the same.

court to make *de novo* determinations to the extent that a party makes specific objections to a magistrate judge's findings).

## FINDINGS OF FACT

The Magistrate Judge set forth his factual findings from the hearing held on May 24, 2017 (*see* Dkt. 832 at 4-9), and based upon this Court's *de novo* review of the record, those factual findings are fully supported by Lieutenant Brown's testimony and the exhibits admitted during the May 24, 2017, hearing. They are incorporated by reference into this Decision and Order, and will only be summarized here.

In sum, Lieutenant Brown, a seven-year veteran with the Darien (Georgia) Police Department, who has received training in commercial and passenger drug interdiction and who is certified in the use of laser and radar equipment to detect the speed of vehicles and the handling of a canine, was patrolling Interstate 95 with Dixie on November 10, 2014. (Dkt. 832 at 4). Lieutenant Brown observed a red Mitsubishi traveling at a high rate of speed, recording a speed of 93 miles per hour on a Lidar device in a 70 mile-per-hour zone. (*Id.* at 4-5). Lieutenant Brown proceeded to stop the red Mitsubishi for speeding, and upon approaching the vehicle, he observed four occupants and detected the odor of alcohol. (*Id.* at 5). Defendant was seated in the driver's side rear passenger seat. (*Id.* at 5). Lieutenant Brown asked the driver, Nicholas Simmons ("Simmons"), who appeared to be reacting slowly, for his license and insurance card. (*Id.* at 5). Lieutenant Brown directed Simmons to exit the vehicle, and upon questioning as to where they were traveling, Simmons' answers were suspicious. For instance, Simmons, whose license reflected an address in Savannah, Georgia, told Lieutenant Brown that they were traveling to Savannah, but it was

- 4 -

located approximately 45 minutes in the opposite direction. (*Id.* at 6). Similarly, Simmons told Lieutenant Brown that the purpose of their trip was a one-hour visit with a friend in Greenville, North Carolina, which was an approximately nine- to ten-hour round trip from Savannah. (*Id.*).

Lieutenant Brown instructed the passengers, including Defendant, to exit the vehicle, and Defendant informed Lieutenant Brown that there was an open container of alcohol in the vehicle that belonged to him and that he had a prior criminal conviction for felony burglary. (*Id.* at 7). Approximately 18 minutes into the traffic stop, Lieutenant Brown asked Simmons if he "had a problem" with him searching the vehicle and Simmons answered "not really, no," at which point Lieutenant Brown responded that he was going to search the vehicle anyway. (*Id.* at 7-8).

Before actually searching the vehicle, Lieutenant Brown executed a dog sniff of the vehicle with Dixie, and she alerted twice by sitting at both the driver-side door and passenger-side door of the vehicle. (*Id.* at 8). Lieutenant Brown then searched the vehicle, finding a jacket in the trunk of the vehicle that contained a .380 caliber handgun in one of the pockets. (*Id.* at 8). Upon making this discovery, Lieutenant Brown asked the group of vehicle occupants who the jacket belonged to, and Defendant indicated that it belonged to him. (*Id.*). Lieutenant Brown then asked Defendant if the weapon belonged to him, and Defendant acknowledged that it did, at which point he was arrested (approximately 25 minutes after the vehicle was initially stopped). (*Id.*). At this point, neither Defendant nor the other occupants of the vehicle had been advised of their *Miranda* rights.

- 5 -

Although Lieutenant Brown discovered open containers of alcohol in the vehicle, he did not find any illegal narcotics. (*Id.* at 8-9). Lieutenant Brown wrote citations charging Defendant with open container violations and possession of a firearm by a convicted felon, whereupon Defendant was transported to jail by another officer. (*Id.* at 9). Lieutenant Brown also wrote Simmons a citation for speeding, and Simmons ultimately paid the fine for his speeding violation. (Gov't Ex. 7).

In addition to the facts, summarized above, elicited during the May 24, 2017, suppression hearing before the Magistrate Judge, additional relevant facts were elicited during the reopened suppression hearing held before the undersigned on December 12, 2017, as set forth below.

As even Defendant concedes (Dtk. 962 at 1 (referencing Lieutenant Brown's testimony as "laudably candid")), Lieutenant Brown offered credible testimony at the reopened suppression hearing. Lieutenant Brown testified that he was trained in the use of radar detection. (Dkt. 951 at 8-9). He had been with the Darien (Georgia) Police Department since July 2011, and had used radar about every day since joining the department. (*Id.* at 10). Lieutenant Brown described radar as a stationary device that cannot be removed from the police vehicle, and on the date in question (November 10, 2014), his police vehicle was equipped with radar. (*Id.* at 10-11). Lieutenant Brown testified that he had also been trained and certified in the use of Lidar (*id.* at 12, 14; Gov't Ex. 9 & 10), which is a handheld device that (unlike radar) uses laser technology to target

a specific vehicle,[2] (*id.* at 12). The Darien (Georgia) Police Department uses a ProLaser III Lidar device, which does not log any information internally or take any photographs. (*Id.* at 12). Like radar, Lieutenant Brown uses Lidar "just about every day." (*Id.* at 17).

Lieutenant Brown described the daily protocol utilized for a Lidar device, which includes turning the machine into an operating position, confirming through an internal test that the machine has passed, and then confirming the accuracy of the machine's distance measurements at the Lidar range. (*Id.* at 18). Then, at the end of a shift, that same distance test is performed at the Lidar range. (*Id.* at 20). In addition to these daily tests, the Lidar machines used by the Darien (Georgia) Police Department are calibrated by an outside company on an annual basis. (*Id.* at 21-22).

On November 10, 2014, Lieutenant Brown detected, using the Lidar device, a speeding vehicle traveling 93 miles per hour in a 70 miles-per-hour zone (a red 2014 Mitsubishi Mirage four door vehicle in which Defendant was a passenger) on I-95 at approximately mile marker 46. (*Id.* at 25-26, 31). The Lidar device had been calibrated by an outside company in September 2014 (*id.* at 26; Gov't Ex. 8[3]), and it also passed

---

[2]     Lieutenant Brown explained that radar is "broad band" so that you pick up every vehicle that is traveling toward the user, whereas Lidar (or laser) is vehicle specific. (Dkt. 951 at 131).

[3]     Lieutenant Brown testified that the certificate of calibration had an error in the serial number of the device. (Dkt. 951 at 27). The serial number on the certificate mistakenly omitted the number "2" so that the serial number was listed as PL8409 when, in fact, the correct number is PL28409. (*Id.*; *see* Gov't Ex. 8). According to Lieutenant Brown, the Police Department only has one ProLaser III device, which has a serial number PL28409. (Dkt. 951 at 27). The certificates for the calibration of this unit in other years contained a correct reference to the serial number. (Dkt. 951 at 80). In addition, the citation issued to

Lieutenant Brown's internal checks both before and after it was used that day,[4] (*id.* at 31-32). The driver of the vehicle ultimately paid a $290 fine pursuant to the ticket that was issued by Lieutenant Brown. (Dkt. 951 at 33-38). In fact, in the video of the stop, Simmons appears to admit to Lieutenant Brown that he was speeding. (*See* Gov't Ex. 2 at 41:03-41:32).

Lieutenant Brown also testified to his training with respect to the handling of Dixie. (*Id.* at 40, 86). He went through a certification process with Dixie on an annual basis between 2011 and 2016, with two separate organizations—the North American Police Work Dog Association and the National Police Canine Association. (*Id.* at 40-42; Gov't Ex. 12-17). Dixie was certified to detect marijuana, cocaine, heroin, methamphetamine, and ecstasy. (Dkt. 951 at 43). Lieutenant Brown described the certification process as one in which the examiner hides narcotics in unknown locations, and the handler and the dog then have to locate the narcotics within a set amount of time. (*Id.* at 40-41). The certification process is a pass/fail system whereby if the handler and the dog miss more than "one hide" then they will not receive certification. (*Id.* at 42). Lieutenant Brown also conducted regular training with Dixie. (*Id.* at 46-49). He kept notes of traffic stops and

---

Simmons for the speeding violation reflected a serial number for the Lidar device of "PL28409". (Gov't Ex. 7).

[4]     Lieutenant Brown and the Department's regular practice is to maintain for a period of time a record of the Lidar range test conducted before and after a shift, but those records for the date in question were discarded in the ordinary course after the traffic ticket was paid by Simmons and the traffic infraction case was closed, and therefore they were not produced. (Dkt. 951 at 38-39).

training with Dixie, which were produced and admitted into evidence as Government Exhibit 11.[5] Lieutenant Brown described Dixie as having a 100% success rate in detecting narcotics. (Dkt. 951 at 55).

## ANALYSIS

As recently reiterated by the Second Circuit Court of Appeals, traffic stops must satisfy the Fourth Amendment's reasonableness limitation, as the detention of an individual during a traffic stop, even on a temporary basis, constitutes a "seizure" within the meaning of the Fourth Amendment. *United States v. Gomez*, 877 F.3d 76, 85-86 (2d Cir. 2017). Thus, in assessing Defendant's motion to suppress, the Court must consider the legality of the initial stop, as well as the reasonableness of the duration of the stop and the search conducted during the stop. Moreover, because Defendant has moved to suppress statements allegedly made during the stop, the Court must consider the voluntariness of those statements in the Fifth Amendment context.

## I. Legality of the Initial Stop of the Vehicle

"Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). Here, the R&R concluded that the stop of the vehicle was supported by reasonable suspicion that the driver was speeding and

---

[5] The notes produced by Lieutenant Brown were not complete, because Dixie was retired at the beginning of 2016 (and as described by Lieutenant Brown, the "log book will go with the dog to whoever it goes to" (Dkt. 951 at 52-53)). Efforts by the Darien Police Department to track down the log book with Dixie's current owners were unsuccessful. (*Id.* at 58-60).

therefore committing a traffic violation, based on its findings with respect to Lieutenant Brown's visual measurement of the speed of the vehicle and the measurement recorded by the Lidar device. (Dkt. 832 at 10). In his objections, Defendant challenges the ability of Lieutenant Brown to visually measure the speed of the vehicle from his position (*i.e.*, he stood within the open driver's side door of the police vehicle observing traffic from a stationary position). (Dkt. 860 at 3). Defendant also challenges the reliability of the Lidar device, attacking the mistaken serial number on the relevant yearly certification, the limited self-testing to only distance, the lack of any retained documentation, and the failure to connect the device to the dashboard video camera. (*Id.* at 3-4; Dkt. 962 at 8).

Defendant's challenge related to the failure to connect the device to the dashboard video camera can be easily dispensed with, since Lieutenant Brown's credible testimony established that it was not possible to connect the Lidar device to any camera within the police vehicle.[6]

Defendant's other challenges are similarly unpersuasive. With respect to Lieutenant Brown's visual measurement, he testified before the Magistrate Judge that he was trained to visually assess the speed of a vehicle. (Dkt. 643 at 10). On the date in question, Lieutenant Brown observed the red Mitsubishi traveling at a high rate of speed, thus causing him to further measure the vehicle's speed with the Lidar device. (Dkt. 642 at 16,

---

[6] According to Lieutenant Brown, the dashboard video camera is for radar, but the Darien Police Department has not connected its vehicles' cameras to the radar devices and, therefore, the video reflects "radar off" meaning that the radar is not connected to the camera—not that the radar device is off. (Dkt. 951 at 23-26).

22). In other words, it was not just Lieutenant Brown's visual measurement of the vehicle's speed that caused him to pull it over, but it was that visual measurement coupled with the Lidar reading of 93 miles per hour. *Cf. United States v. Sowards*, 690 F.3d 583, 591 (4th Cir. 2012) ("the reasonableness of an officer's visual speed estimate depends, in the first instance, on whether a vehicle's speed is estimated to be in significant excess or slight excess of the legal speed limit. If slight, then additional indicia of reliability are necessary to support the reasonableness of the officer's visual estimate.").

This Court is similarly unpersuaded by Defendant's challenges to the reliability of the Lidar device.[7] Lieutenant Brown's credible testimony established that the device had just been certified in September 2014 (albeit there was a mistaken serial number reflected in the certification), and that his self-testing of the device both before and after his shift on the day of the stop established that it was working correctly. In short, the evidence introduced at both the May 24, 2017, and December 12, 2017, hearings established that the Lidar device was reliable, and that the vehicle in which Defendant was a passenger was traveling at an excessive rate of speed, thus providing probable cause for Lieutenant Brown to stop the vehicle. Indeed, the undisputed evidence in the record establishes that the driver of the vehicle admitted that he was speeding. (*See* Gov't Ex. 2 at 41:03-41:32; Gov't Ex. 7; Dkt. 951 at 31-38).

---

[7] The Magistrate Judge denied Defendant's request for discovery concerning the reliability of the Lidar device. (Dkt. 832 at 10 n.4). However, when this Court reopened the hearing and allowed for discovery concerning Dixie, it also allowed for discovery regarding the Lidar device's certification.

## II.    Duration of the Traffic Stop

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 1614 (2015).  In other words, a traffic stop may not ordinarily last any longer than necessary to address the traffic infraction.  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*.  Tasks considered within the realm of an ordinary traffic stop include determining whether to issue a traffic ticket, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id*.

"An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 1615.  As explained by the Supreme Court, the Fourth Amendment will tolerate unrelated investigations so long as the roadside detention is not lengthened as a result. *Id*. Recently, the Second Circuit clarified that the Supreme Court's decision in *Rodriguez* abrogated its prior decision in *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010). *See United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017).  As a result, "tasks not related to the traffic mission, such as dog sniffs or '[o]n-scene investigation into other crimes,' are unlawful if they prolong the stop absent independent reasonable suspicion." *Id*. at 89 (quoting *Rodriguez*, 135 S.Ct. at 1616).  Thus, "the 'critical question' is not whether the

unrelated investigation 'occurs before or after the officer issues a ticket,' but whether conducting the unrelated investigation 'prolongs—*i.e.*, adds time to—the stop." *Id.* (quoting *Rodriguez*, 135 S. Ct. at 1616); *see Rodriguez*, 135 S. Ct. at 1612 ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." (alterations in original) (internal quotation marks omitted)).

A traffic stop may be extended "for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). "The existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances." *Gomez*, 877 F.3d at 92. Reasonable suspicion must be "'supported by articulable facts that criminal activity may be afoot,' and it cannot be based on "'inchoate suspicion or mere hunch.'" *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000)). While a court should evaluate the totality of the circumstances "'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,'" a court should not "'merely defer to the police officer's judgment.'" *Id.* (quoting *Bayless*, 201 F.3d at 133).

Here, it does not appear as though the Magistrate Judge made any specific findings as to whether the roadside detention was prolonged beyond the time necessary to complete

the tasks related to the traffic infraction. Instead, the R&R concluded that based on the totality of the circumstances, Lieutenant Brown had reasonable suspicion that criminal activity was afoot and, therefore, Lieutenant Brown was justified in extending the traffic stop for investigatory purposes. (Dkt. 832 at 11-12).

In his objections, Defendant contends that the almost 20 minute time period between the stop of the vehicle and the search was "far longer than necessary for Lt. Brown to issue a speeding citation, to check the status of Mr. Simmon's driver's license, to obtain registration and proof of insurance for the vehicle and to determine if he had any outstanding warrants." (Dkt. 860 at 4-5). The Government disputes Defendant's contention, and, relying in part on the Second Circuit's decision in *Harrison*, contends that the approximately 19-minute delay between the traffic stop and search was reasonable. (Dkt. 885 at 18-19). However, after the Government submitted its filing, the Second Circuit issued its decision in *Gomez*, indicating that *Harrison* has been abrogated by the Supreme Court's decision in *Rodriguez*.

This Court need not resolve whether the dog sniff extended the time beyond that needed to complete the tasks related to the traffic stop for the speeding violation, because the record fully supports the R&R's conclusion that Lieutenant Brown had reasonable suspicion that criminal activity was afoot, and as a result, he was justified in prolonging the traffic stop. Lieutenant Brown's credible testimony established that he smelled alcohol as he was approaching the car; open containers of alcohol were present in the vehicle; the driver's movements were slow, he appeared nervous, and his answers to Lieutenant Brown's questions were suspicious (including the confusing answers regarding his

- 14 -

criminal history, his apparent failure to realize he had traveled 45 minutes past his destination, and his eight to nine hour day trip for a one hour visit); and the interstate at issue was a known thoroughfare for narcotics trafficking.

In his objections, Defendant challenges the alleged failure of Lieutenant Brown to ask follow-up questions to Simmons' confusing and suspicious answers. (Dkt. 860 at 5-6). As did the Magistrate Judge, this Court disagrees with Defendant's logic. First, there is nothing in the record suggesting that any follow-up questions would have resolved the suspicions—that is just speculation on Defendant's part. Second, as noted by the Magistrate Judge, the law "'does not demand that all possible innocent explanations be eliminated before conduct can be considered as part of the totality of circumstances supporting a reasonable basis to believe that criminal activity may be afoot.'" (Dkt. 832 (quoting *United States v. Bailey*, 743 F.3d 322, 333 (2d Cir. 2014))). Third, the relevant inquiry is not whether a law enforcement officer's suspicions are ultimately correct—rather, the inquiry is simply whether they are reasonable.

Defendant also cites to Lieutenant Brown's apparent misunderstanding as to the nature of the criminal liability, if any, associated with having an open container of alcohol in a vehicle, claiming that this demonstrates Lieutenant Brown's alleged bad faith and his intent to search the vehicle. (Dkt. 860 at 6-7). Again, this Court disagrees. First, the Magistrate Judge found Lieutenant Brown credible, concluding that his mistaken understanding of the law did not "demonstrate bad faith or purposeful deception." (Dkt. 832 at 17 n.5). Not only must a district court give appropriate deference to the credibility determinations made by the magistrate judge who heard the witness testimony, *see United*

- 15 -

*States v. Raddatz*, 447 U.S. 667, 675-76 (1980); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999); *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013); *United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009), but in this case, the undersigned had the opportunity to observe Lieutenant Brown at the reopened suppression hearing and found that he was entirely credible. Second, Lieutenant Brown's subjective intent is not the issue—rather, the inquiry is an objective one. *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) ("Whether probable cause or reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." (quoting *Wren v. United States*, 517 U.S. 806, 806 (1996))).

Accordingly, for the reasons set forth herein and for the reasons set forth in the R&R, this Court concludes that the traffic stop was not prolonged in violation of Defendant's Fourth Amendment rights.

## III.    Consent to Search the Vehicle

"The Government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Calvente*, 722 F2d 1019, 1023 (2d Cir. 1983). Here, the Magistrate Judge concluded that the Government had met this burden. (Dkt. 832 at 20). This Court agrees.

"The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995). Resolution of that question is an issue of fact based upon a totality of the circumstances, including the "age, education, [and] intelligence [of the defendant], [the]

length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights." *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986).

Here, for the reasons set forth in the R&R (Dkt. 832 at 20-23), the Court agrees that Simmons voluntarily consented to the search of the vehicle. The record reflects that Simmons was an adult male who did not suffer from any apparent physical or mental disabilities; he had some familiarity with the criminal justice system; he was not handcuffed or physically restrained at the time of his consent; and there had been no show of physical force or brandishing of weapons by the officers. (*Id.* at 21). Moreover, as discussed in the R&R, the fact that Lieutenant Brown indicated, after obtaining consent, that he intended to search the vehicle in any event, does not change that analysis. (*Id.* at 22-23).

The Court does note that the R&R did not specifically address whether the consent to search the vehicle extended to the pockets of the jacket belonging to Defendant located in the trunk of the vehicle.[8] Defendant does not expressly raise an objection to the R&R on this ground and, therefore, has arguably waived any such objection.[9] *See* Fed. R. Crim.

---

[8]     The R&R appropriately concluded that for purposes of the probable cause analysis, the existence of probable cause to believe that a vehicle contains contraband would extend the scope of the search to the contents of the vehicle, including the jacket in the trunk and the interior pockets of the jacket. (Dkt. 832 at 15). However, whether the consent to search the vehicle includes a passenger's jacket in the trunk of the vehicle is not specifically addressed in the R&R.

[9]     Defendant argues in his objections that once Lieutenant Brown "inquired as to whom the jacket belonged it became incumbent upon [him] . . . to then obtain either consent from Mr. Jenkins or probable cause to search the jacket itself." (Dkt. 860 at 11). However,

P. 59(b)(2) ("Failure to object in accordance with this rule waives a party's right to review."); *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009) (to trigger the *de novo* review standard, objections to a report "must be specific and clearly aimed at particular findings in the magistrate judge's proposal").

In any event, this Court concludes that it was objectively reasonable for Lieutenant Brown to conclude that Simmons' general consent to search the vehicle included consent to search articles of clothing left in the common spaces of the vehicle. *See United States v. Dishman*, 12 Fed. App'x 289, 292-93 (6th Cir. 2001) (consent of driver of vehicle to search included search of jacket belonging to passenger that was located in vehicle); *United States v. Anderson*, 859 F.2d 1171, 1176-77 (3d Cir. 1988) (driver of vehicle had common authority over trunk of car and could validly consent to search thereof, including contents in trunk that belonged to passenger); *United States v. Melgar*, 927 F. Supp. 939, 948 (E.D. Va. 1996) (passenger in vehicle has no reasonable expectation of privacy in personal property placed in the car, including jacket containing firearm). *Cf. United States v. Sparks*, 287 Fed. App'x 918, 920 (2d Cir. 2008) (driver of vehicle had apparent authority to consent to search of passenger's Tote Bag, even though passengers "retain an actual, reasonable, socially recognized expectation of privacy in their luggage, even when it is transported in a vehicle driven by or shared with others." (citing *Bond v. United States*, 529 U.S. 334, 338-39 (2000))). Therefore, the Court agrees with the R&R's conclusion that

---

this argument is based upon a factually inaccurate premise. Lieutenant Brown discovered the firearm in the jacket before asking the group who owned the jacket. (*See* Gov't Ex. 2 at 23:53; Dkt. 642 at 44-45).

the Government met its burden to establish that Simmons' consent to search the vehicle was valid.

## IV.   Probable Cause to Search the Vehicle

The R&R concluded that "[i]n light of [Lieutenant] Brown's training and experience, his observations of Simmons' demeanor, Simmons' suspicious answers, and Dixie's alerts, Brown had probable cause to search the vehicle for contraband." (Dkt. 832 at 15). In his objections, Defendant challenges this conclusion, primarily attacking the reliance upon Dixie. (Dkt. 860 at 7-9; Dkt. 962 at 1-7).

As noted above, this Court agrees with Defendant that pursuant to the Second Circuit's decision in *United States v. Foreste*, 780 F.3d 518 (2d Cir. 2015), Defendant was entitled to appropriate disclosure concerning Dixie's training and certification, and he also was entitled to reopen the suppression hearing to challenge Dixie's reliability based upon that discovery. However, after considering the additional evidence introduced at the December 12, 2017, hearing, coupled with the evidence elicited during the hearing on May 24, 2017, this Court concludes that the Government established that Dixie was reliable and, as a result, her alerts appropriately served as a basis for the R&R's finding of probable cause to conduct the vehicle search.

The Supreme Court set forth the standard for assessing the presence of probable cause to conduct a search in *Florida v. Harris*, 568 U.S. 237 (2013):

> A police officer has probable cause to conduct a search when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present. The test for probable cause is not reducible to precise definition or quantification. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of

the evidence . . . have no place in the [probable-cause] decision. All we have required is the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.

*Id.* at 243-44 (alterations in original) (internal quotation marks and citations omitted). The Supreme Court described the test as employing a "practical and common-sensical standard" based upon "the totality of the circumstances." *Id.* at 244 ("Probable cause, we emphasized, is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." (internal quotation marks omitted)).

Here, the Government established that Dixie was certified on an annual basis and that she underwent regular training. In addition, her handler, Lieutenant Brown, described her performance accuracy as 100%. There is nothing in the record to contradict this assessment. In a conclusory manner, Defendant attacks the credibility of the organizations that certified Dixie, contending that the two organizations (the North American Police Work Dog Association and the Nation Police Canine Association) were not established by the Government to be "bona fide." (Dkt. 962 at 3). However, while detailed information about the organizations themselves was not presented, it was not required. Rather, Lieutenant Brown testified to the stringent protocols required for certification, where the failure to detect more than one narcotics hide during closely monitored and timed testing will result in the failure to receive certification. In this case, Dixie never failed her certification tests.

Defendant similarly challenges Dixie's training, arguing that there were no set protocols or regular attendance. (Dkt. 962 at 4). However, again, Lieutenant Brown

testified that Dixie underwent training on a regular basis. The fact that the training was not regimented to the degree that Defendant contends it should have been does not undermine Dixie's reliability, particularly when the undisputed evidence in the record establishes that Dixie's ability to detect narcotics was superb.

Defendant challenges the document retention policy of the Darien Police Department, including the fact that Dixie's log book went with Dixie when she retired and can no longer be located, thus leaving only relatively limited records of her field performance. (Dkt. 962 at 4-5). However, the field records that did exist were produced, and all of Dixie's annual certifications were produced. As noted by the Supreme Court, the performance of a dog in the field will in most cases "have relatively limited import." *Harris*, 568 U.S. at 245. While Defendant's challenges to the document retention practices of the Darien Police Department are fair criticisms, they do not undermine Dixie's reliability based on the record in this case.

Defendant further challenges Dixie's free air sniff on November 10, 2014, specifically contesting Lieutenant Brown's testimony that Dixie performed an initial head shot and his handling of Dixie on the date in question. (Dkt. 962 at 5-6). However, Lieutenant Brown's credible testimony established that the free air sniff and his handling of Dixie was appropriate and, contrary to efforts to establish otherwise on cross-

examination, Lieutenant Brown did not direct Dixie to make any particular findings as to the presence of narcotics.

Defendant also challenges both the certification process and training on the ground that neither contained any protocol or testing for residual odor. (Dkt. 962 at 3-4). The Supreme Court has acknowledged the ability of canines to detect residual orders:

> [I]f the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person.

*Harris*, 568 U.S. at 245-46. As further explained by the Supreme Court:

> A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked). In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found.

*Id.* at 246 n.2. In other words, even though Lieutenant Brown did not locate narcotics within the red Mitsubishi vehicle, that does not mean that narcotics were not in the vehicle, or that they had not been in the vehicle at any time prior. Rather, it simply means that Lieutenant Brown was not able to locate them in the vehicle on the date in question. It certainly does not mean that Dixie's alert was inaccurate, nor has there been anything presented in this record to suggest that certification or training specifically targeted to

residual odors is necessary. The point of certifying and training the canine is to ensure the ability to detect odors of narcotics, whether they be residual or otherwise.

As explained by the Supreme Court:

[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Id.* at 246-47. As with the dog in *Harris*, this Court concludes that in this case, Dixie's "sniff" was "up to snuff." *Id.* at 248. Here, the Government established that a trained narcotics dog, repeatedly certified and described by her handler as having 100% accuracy, alerted twice to the vehicle. Defendant's challenges to the record keeping and protocols for training and certification do not undermine the Government's proof that Dixie was reliable. Moreover, as emphasized by the Government in its post-hearing submission, Dixie's alerts were just one aspect of the probable cause bases that justified the search. (*See* Dkt. 961 at 26). Based upon a consideration of all the evidence in the record, this Court agrees with the R&R's conclusion that Lieutenant Brown had probable cause to search the vehicle in which Defendant was riding as a passenger on November 10, 2014.

## V.     Defendant's Standing to Contest the Search

The Government argued before the Magistrate Judge, and continues to contend before this Court, that Defendant lacked standing to move to suppress the evidence seized

from a vehicle that he did not own and in which he was simply traveling as a passenger. (Dkt. 961 at 27). The R&R did not resolve that issue. (Dkt. 832 at 20 n.7). Similarly, because this Court concludes that Lieutenant Brown had probable cause to conduct the search, and furthermore that Simmons consented to the search, the Court need not resolve the Government's standing argument.

## VI.  Defendant's Statements

The R&R concluded that Defendant was not in custody at the time he made alleged statements during the traffic stop. (Dkt. 832 at 23-24). Specifically, the R&R relied upon the location of the exchange (a public highway rather than a police station or cruiser), the fact that Defendant was not physically restrained in any manner at the time of the exchange, the non-confrontational nature of the interactions between Lieutenant Brown and Defendant, and the apparent cordial conversation between Defendant and the other officer who arrived on the scene. (*Id.* at 24). Although Defendant was directed to stay put while Lieutenant Brown conducted the search of the vehicle, Defendant was not restrained in any way, and Lieutenant Brown's question regarding ownership of the jacket was generally directed at all occupants of the vehicle. (*Id.*).

Defendant objects to these findings, arguing that at the time of the alleged statements, a reasonable person in Defendant's position would have believed that he was under restraint commensurate with a formal arrest. (Dkt. 860 at 12-13). This Court disagrees. Based upon the totality of the circumstances, the Court agrees with the R&R's conclusions that Defendant was not in custody, and that *Miranda* warnings were not implicated. Lieutenant Brown's direction to Defendant to stay put at the side of the road

while he searched the vehicle does not alter that conclusion. *See Georgison v. Donelli*, 588 F.3d 145, 157 n.4 (2d Cir. 2009) ("An individual is not always 'in custody' even if (s)he is not free to leave the confrontation with police. . . . For example, a motorist who has been stopped by the police for a traffic infraction is clearly not free to leave the confrontation, yet *Miranda* rights are not implicated." (citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984))); *United States v. Wong Ching Hing*, 867 F.2d 754, 756 (2d Cir. 1989) (suspect was not in custody for *Miranda* warnings during 30-minute traffic stop). As a result, Defendant was not entitled to *Miranda* warnings at the time he made the alleged statements.

## CONCLUSION

The Court has conducted a careful review of the R&R and the record pertaining to the suppression motion, including the filings before the Magistrate Judge, the transcript of the May 24, 2017, suppression hearing, evidence elicited during the reopened suppression hearing on December 12, 2017, and the additional filings held before the undersigned. Based upon its *de novo* review, the Court hereby denies Defendant's motion to suppress the evidence and statements obtained on November 10, 2014 (Dkt. 522), and the Court accepts and adopts the R&R (Dkt. 832) and overrules Defendant's objections (Dkt. 860).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: January 8, 2018
Rochester, New York